SCOTT L. FROST, ESQ., CA Bar No. 258063
scott@frostlawfirm.com
ANDREW SEITZ, ESQ., CA Bar No. 273165
andrew@frostlawfirm.com
DAVID WHITE, ESQ., CA Bar No. 357055
dwhite@frostlawfirm.com
**FROST LAW FIRM, PC**
273 West 7th Street
San Pedro, CA 90731
Tel.: (866) FLF-MESO
Fax: (833) FLF-MESO

and

JOHN M. CARON, ESQ., CA Bar No. 130633
**THE LAW OFFICES OF WORTHINGTON & CARON, PC**
273 W. 7th Street
San Pedro, CA 90731
Tel.:(310) 221-8090
Fax.: (310) 221-8095

**Attorneys for Plaintiffs**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| **SCOTT L. HULTNER** and **GERALDINE E. HULTNER,**<br><br>                              Plaintiffs,<br><br>        vs.<br><br>**AIR & LIQUID SYSTEMS CORPORATION** (*sued individually and as successor-in-interest to* BUFFALO PUMPS, INC.), et al.<br><br>                              Defendants. | CASE NO. 8:24-cv-00409-JLS-DFM<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMMARY JUDGMENT**<br><br>Separately-Filed Related Documents:<br>1.  Plaintiffs' Statement of Genuine Disputes of Material Fact;<br>2.  Declaration of David White<br><br>Date:        May 2, 2025<br>Time:        10:30 a.m.<br>Courtroom:  8A |

Judge:        Hon. Josephine L. Staton

Trial Date: TBD
Complaint Filed: February 27, 2024

# TABLE OF CONTENTS

**I.  INTRODUCTION AND SUMMARY OF ARGUMENT** ................................. 1

**II.  STATEMENT OF FACTS** ...................................................................... 2

    **A.  Background** ................................................................................... 2

    **B.  Mr. Hultner Was Exposed to Dust from GE Equipment.** ............ 3

    **C.  The Dust From the GE Products Contained Asbestos.** ................ 6

    **D.  Mr. Hultner's exposure to asbestos from GE products was substantial.** ................. 7

    **E.  GE knew about the hazards of asbestos and did not warn users like Mr. Hultner of those hazards.** ............................................................ 9

**III.  LEGAL ARGUMENT** ............................................................................ 11

    **A.  Summary Judgment is a Drastic Measure that Must be Narrowly Construed.** ...... 11

    **B.  Under *DeVries*, GE had a duty to warn users of the hazards of asbestos associated with its products.** ............................................................ 11

        1.  GE's equipment required incorporation of asbestos-containing parts. .................... 12

        2.  GE had reason to know that the integrated product was dangerous during its intended maintenance and use. ................................................. 13

        3.  GE had no reason to believe that users like Mr. Hultner would realize the danger. 14

    **C.  GE's failure to warn or otherwise take action caused Mr. Hultner to be exposed to asbestos.** ................................................................................ 15

    **D.  Exposure to asbestos from GE turbines was a substantial factor in causing Mr. Hultner's mesothelioma.** ............................................................ 15

    **E.  The cases GE cites do not match the facts of this case.** ............... 19

    **F.  Plaintiffs' Claims Against GE are not Preempted by Government Contractor Immunity.** ..................................................................................... 21

        1.  Defendants' government contractor affirmative defense fails under both Boyle and Yearsley because Defendants' equipment did not conform to the Navy specification requiring them to warn of hazards of their products. ..................... 23

        2.  Defendant's government contractor defense fails because the Navy did not consider asbestos to be a hazard during the relevant time period. ................. 23

    **G.  Partial summary judgment as to loss of consortium and punitive damages should be denied.** ................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.* (1979) ................................................................................ 11

*Air & Liquid Systems Corporation v. DeVries* (2019) ................................................ 12, 16

*Am. Manufacturers Mutual Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc.,*(2d Cir. 1967) .... 11

*Cabalce v. Thomas E. Blanchard & Associates, Inc.*, 797 F.3d ................................................ 22

*Cabasug v. Crane Co.*, 989 F.Supp.2d 1027 (D. Haw. 2013) ................................................ 17

*Campbell-Ewald Co. v. Gomez,* 577 U.S. ........................................................................ 22

*CEH, Inc. v. F/V Seafare*,70 F.3d (1st Cir. 1995) ........................................................ 25

*Cook v. Foster Wheeler Energy Corp.*, 1:21-cv-11362-ADB *5-6 (D. Mass. Sep. 1, 2023).............. 26

*Duenas v. Gen. Elec. Co.*, MDL No. 875 ........................................................................ 23

*Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019) ........................................................ 24

*Elorreaga v. ViacomCBS Inc.* (9th Cir., Oct. 3, 2024, No. 23-16041) .................................. 21

*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 (2008) ................................................ 26

*Exxon Valdez* 270 F.3d 1215, 1226 (9th Cir. 2001) ........................................................ 25

*Hanford Nuclear Reservation Litig.*, 534 F.3d ................................................................ 22

*Harbour v. Armstrong World Indus., Inc.*, 932 F.2d 968 (6th Cir. 1991) ............................ 16

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ........................................................................ 11

*Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488 (2015) ...................................... 16

*McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1176 (9th Cir. 2016) ........................ 16

*McKay v. Rockwell Intern. Corp.,* 704 F.2d ................................................................ 22

*Pelton v. John Crane, Inc.*, 1:21-cv-4316 *17-18 (N.D. Ill. Jan. 31, 2024).......................... 27

*Pritt v. Air & Liquid Sys. Corp.*, No. 19-cv-10651, 2022 WL 902684 .............................. 27

*Pritt v. John Crane Inc.*, No. 20-cv-12270, 2023 WL 4471825........................................ 27

*Rogers v. A.O. Smith Corp.* 602 F. Supp. 3d 748 (E.D. Pa. 2022) .................................... 20

*Society of the N.Y. Hosp. v. Ass'd Hosp. Service of N.Y.*, (S.D.N.Y. 1973) ...................... 11

*Sommer v. Hilton Hotels, Corp.*, 376 F.Supp. 297 (S.D.N.Y. 1974) ................................ 11

*Sullivan v. A.W. Chesterton Co.*, No. 18-3622, 2022 WL 1013428, (E.D. Pa. Apr. 1, 2022)............ 21

*The Amiable Nancy*, 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456 (1818) .............................. 25

*U.S. v. Texas*, 507 U.S. 529, 534 (1993) ........................................................................ 26

*Warrington v. 3M Co.* (E.D. Pa., Aug. 15, 2023, Civil Action 21-cv-03207) ........................ 19

*Willis v. BW IP Int'l Inc.*, 811 F. Supp. 2d.................................................................... 23

*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. .................................................................. 22

## Statutes

Fed. R. Civ. P. 56(a) ........................................................................................................ 11

TABLE OF AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

General Electric ("GE") GE knew of the hazards of asbestos associated with its products in the 1930s, yet chose not to warn of those hazards through the 1940s, 1950s, 1960s, and 1970s. GE representatives had a chance to make amends when they were present for an overhaul of GE turbines and saw sailors like Plaintiff Scott L. Hultner in the area of the turbines without respiratory protection. The GE representatives chose to do nothing, and Mr. Hultner received a terminal cancer as a result.

Decedent Scott L. Hultner (Mr. Hultner) was diagnosed with mesothelioma on or about November 30, 2023. His mesothelioma was caused, in part, by exposure to asbestos from a turbine designed, manufactured, and supplied by Defendant General Electric ("GE") while he was serving as a Machinist Mate in the United States Navy.

GE has moved for summary judgment on the grounds that Plaintiffs fail to show that exposure from GE products caused Mr. Hultner's mesothelioma, that there is no causal connection between GE's failure to warn and Mr. Hultner's mesothelioma, that GE did not owe Mr. Hultner a duty to warn, that GE is shielded from liability by the government contractor defense, and that Mr. Hultner may not seek non-pecuniary and loss of consortium damages.

As set forth below, summary judgment should be denied because there is a triable issue of fact as to whether exposure to asbestos-containing products that GE is liable for was a substantial factor in the development of Mr. Hultner's mesothelioma, and as to

whether, under *DeVries*, GE had a duty to Mr. Hultner to warn him of hazards of asbestos component parts.

There are also triable issues of fact as to the causal connection between GE's failure to warn and the development of Mr. Hultner's mesothelioma. Further, GE is not shielded from liability under the government contractor defense.

Moreover, GE misreads the recent Supreme Court opinions on damages under maritime law, and thus partial summary judgment as to Plaintiffs' loss of consortium and punitive damages claims should be denied.

GE's motion for summary judgment should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Background

Mr. Hultner was diagnosed with malignant mesothelioma after having served in the United States Navy from 1971 through early 1978. (**Ex. 1**, Report of Captain Arnold Moore ["Moore Report"], at p. 3-5.) Mr. Hultner completed basic training at the Naval Training Center in San Diego, California in June of 1971. (*Id.* at p. 3.) Mr. Hultner subsequently attended the Navy Basic Propulsion School at the Great Lakes Naval Training Center in the summer of 1971, graduating in October of 1971. (*Ibid.*) After graduation, Mr. Hultner was assigned to the USS Juneau (LPD-10) ("Juneau") for a period of 75 days. (*Ibid.*) Mr. Hultner's work on the Juneau involved cross training on a variety of equipment, including pumps and valves. (*Id.* at p. 4.)

Mr. Hultner then attended and graduated from nuclear power school at Vallejo, California. (*Id.* at p. 3) Mr. Hultner served aboard the USS John Adams (SSBN-620) ("John Adams"), a nuclear-powered submarine, from April 1973 through January 1978. (*Ibid.*) While serving aboard the John Adams as a Machinist Mate, Mr. Hultner was responsible for working on "everything from the reactor back to the propeller" including, steam generators, turbine generators, generator oil systems, distilling plants, pumps, valves, all the high-pressure steam equipment and plant charging valves. (*Id.* at p. 4.) Mr. Hultner also stood watches as the engineering supervisor. (*Ibid.*) Mr. Hultner testified that he and his shipmates "did a ton of maintenance on everything to get it ready to go to sea to ensure we didn't have any problems at sea." (*Ibid.*)

### B.    Mr. Hultner Was Exposed to Dust from GE Equipment.

GE manufactured the turbines and propulsion reduction gear installed on both the Juneau and the John Adams. (**Ex. 1**, Moore Report p. 27, 34.) GE plan numbers specify the use of nineteen asbestos sheet gaskets and six metallic-asbestos gaskets for each set of propulsion turbines aboard the Juneau. (*Ibid.*) GE plan numbers for these turbines indicate that GE was fully aware that the turbines would be insulated. (*Ibid.*) Aboard the John Adams, GE's main propulsion turbines required a variety of asbestos containing parts as well as asbestos-containing insulation and insulation pads. (*Id.* at p. 35.) The main propulsion turbines aboard the Juneau and John Adams would not be removed from the ship during overhauls unless the entire turbine was removed or replaced. (*Ibid.*)

Mr. Hultner testified that during an overhaul of the main propulsion turbines aboard the John Adams, he and other shipmates worked in close proximity to the turbines. (**Ex. 2**, Deposition of Plaintiff Scott L. Hultner ["Hultner Depo"] p. 954:12-955:17.) Mr. Hultner testified that he worked within 6 or 7 feet of the turbines and throughout the engine room while this overhaul took place. (*Id.* at 955:3-17) Mr. Hultner added that insulation blankets had to be removed to open the turbine casings while he was working in the area. (*Id.* at p. 956:2-15.) Mr. Hultner further described "field days" as cleanup days where the sailors would wipe down everything in the John Adams to get rid of all the dust. (*Id.* at p. 958:5-15.)

Mr. Hultner's shipmate on the John Adams, Dale Armbrister, corroborated Mr. Hultner's account of exposure to GE equipment aboard the John Adams. (**Ex. 3**, Deposition of Dale Armbrister ["Armbrister Depo"], p. 11:8-20; 12:5-12; 46:22-52:2.) Mr. Armbrister testified that he and Mr. Hultner observed the removal of insulating blankets from GE turbines aboard the John Adams in order to repair the turbines. (*Id.*) This work created dust. (*Id.* at p. 48:22-49:1.) Mr. Armbrister testified that he, Mr. Hultner, and the other machinist mates had to work in and around the dust from GE's equipment. (*Id.* at p. 48:22-52:2.) Mr. Armbrister described "field day" where he, Mr. Hultner, and their fellow sailors on the John Adams would undertake major cleanup operations on the submarine, exposing the men to dust from the insulating blankets on the turbines. (*Id.* at p. 49:23-52:1.)

Another of Mr. Hultner's shipmates on the John Adams, Roy Haile, further described the processes by which he and Mr. Hultner were exposed to dust from GE's equipment. (**Ex. 12**, Deposition of Roy Haile ["Haile Depo"], p. 9:6-8; 39:9-42:24.) Mr. Haile testified that he knew the turbine on the John Adams was made by GE because the brand name was on the equipment. (*Id.* at 39:9-12.) Mr. Haile described the dust created from cleaning the equipment during "field days." (*Id.* at 39:22-40:5.) Mr. Haile further described the blanket covering the turbine as white in color and producing a white dust which the sailor had to clean up. (*Id.* at 41:10-42:23.)

When the turbines aboard the John Adams required an overhaul, GE representatives were present to oversee the maintenance. (**Ex. 2**, Hultner Depo., p. 954:12-25.) At no point did these GE representatives attempt to warn Mr. Hultner nor did these representatives advise Mr. Hultner that he should have been wearing respiratory protection. (*Id.* at p. 67:5-22; 1007:4-9.) Mr. Haile testified that he and his fellow sailors aboard the John Adams had no expectation that they could have been harmed by working with equipment and materials like the ones provided by GE. (**Ex. 12**, Haile Depo, p. 43:5-15.)

GE also manufactured two generators driven by steam turbines installed aboard the Juneau and the John Adams. (**Ex. 1**, Moore Report, p. 36.) These generators utilized asbestos containing gaskets. (*Id.* at p. 22; 27-28.) Mr. Hultner recalled one instance of a steam leak from these generators, requiring repair of the generator and work on the gaskets. (**Ex. 2**, Hultner Depo, p. 195:9-19; 196:7-13; 197:14-19.) Mr. Hultner stood watch for much of this repair which took around eight to ten hours. (*Id.*)

### C.    The Dust From the GE Products Contained Asbestos.

The GE plans for turbines manufactured during that time period specified the use of asbestos sheet gaskets and metallic-asbestos gaskets, asbestos insulating pads, and asbestos insulation spacers. (**Ex. 1**, Moore Report, p. 35.) Consistent with those plans, Plaintiffs' expert Captain Moore stated that the flange bolts for the turbine casing would have originally been asbestos felt and asbestos cloth because it was the only product used for that application. (*Ibid*.) GE was well aware that the turbines would be insulated, evidenced by several GE plans that stated "lagging clips to be supplied & tack welded to casing." (*Id.* at p. 27.)

GE's Rule 30(b)(6) witness Mr. Burt testified in a prior case that he was not surprised that handholes and manholes gaskets for the crossover piping would contain asbestos. (**Ex. 4**, Deposition of Michael Burt ["Burt Depo."], p. 42:15-44:4, 46:3-7.) Mr. Burt testified that asbestos-containing insulation on the GE turbine was an option that may have been used as it operated at high temperatures. (*Id.* at 48:10-16, 56:8-59:2.)

There is no direct evidence that any of the original asbestos parts of the GE equipment aboard the Juneau or John Adams was replaced prior to Mr. Hultner's time on the ships. Moreover, any replacement parts likely came from GE. Mr. Burt testified that GE gave technical advice to users over the lifetime of the turbines. (**Ex. 4**, Burt Depo., p. 61:24-62:5.) Plaintiffs' expert Captain Moore agrees that it was likely that repair parts were ordered from the original equipment manufacturers. (**Ex. 1**, Moore Report, p. 44.) Mr. Hultner also testified that all repair parts used on the machinery on the John Adams

had been provided by the original equipment manufacturers and cited that each of the components he used were an exact fit. (**Ex. 2**, Hultner Depo., p. 450:19-451:3.)

These parts contained asbestos through the time Mr. Hultner served in the Navy, and for some applications until much later. The most of the insulation on Navy nuclear powered submarines, including the insulation on turbines, was asbestos through 1975, with undamaged asbestos insulation remaining on the ships beyond that date. (**Ex. 1**, Moore Report, p. 22-23.) Even in 1990, a letter written by GE stated that "the industry has developed a variety of non-asbestos replacements but none are exact substitutes. Typically, the non-asbestos products cannot be directly substituted for the asbestos gaskets. . ." (*Id*. at 22.)

**D.    Mr. Hultner's exposure to asbestos from GE products was substantial.**

Plaintiffs' industrial hygienist Dr. Terry Spear will testify that gasket exposure studies conducted by the Navy in the 1970s showed that removing asbestos gaskets exceeded the OSHA permissible exposure limits in place at the time. (**Ex. 5**, Spear Report, p. 49.)  He will also provide testimony that airborne asbestos fibers generally settle from the air very slowly by normal air currents or worker activities, and even settled fibers can easily be re-suspended by sweeping up the area. (*Id*. at p. 59-60.) He will testify that removal of asbestos insulation can result in significant exposures, (*Id*. at p. 53-54, 57-58), and that removal of asbestos blankets results in exposures of 1.4 to 3.0 million parts per cubic foot. (*Id*. at p. 53-54.)

Plaintiffs' epidemiology expert Dr. Marty Kanarek will testify that exposures from working with gaskets can lead to an exposure to fibers of 1.7-6.8 fibers/cc, and that just 2 fibers/cc over the course of an 8-hour workday would result in the inhalation of 16,000,000 asbestos fibers of 5 microns in length, and with perhaps billions or trillions of smaller fibers present. (**Ex. 6**, Kanarek Report, at ¶ 21.) Removal of a gasket, including by using a wire brush, results in an exposure dose of 1,700,000 to 11,000,000 asbestos fibers 5 microns in length or over with the possibility of exposure to billions or even trillions of shorter fibers. (*Ibid*.) Moreover, he will also testify that mesothelioma is a dose-response disease where every additional exposure to asbestos leads to a greater risk of mesothelioma. (*Id*. at ¶ 40(c).)

Plaintiffs' expert Dr. Arnold R. Brody will testify "that no amount of exposure to asbestos above the background levels present in ambient air has been established as too low to induce mesothelioma." (**Ex. 7**, Brody Report at ¶ 8, 42.) He will further reply that mesothelioma is a cumulative disease in which the more asbestos a person is exposed to, the more likely they will develop the disease. (*Id*. at ¶ 41.)

Plaintiffs' causation expert, Dr. Brent Staggs, will opine that there is a dose response relationship between asbestos and the development of malignancy, meaning that the more exposure someone has, the higher the risk of developing disease. (**Ex. 8**, Staggs Report, at p. 4.) Dr. Staggs will also be able to provide support that even low levels of exposure increase the risk for mesothelioma. (*Id*. at p. 5-6.) Additionally, he will opine that many cohorts with relatively little exposure show an increased risk of developing

mesothelioma, including family members of workers with asbestos products that bring the dust home on their clothing. (*Id*. at p. 7-8.)

> **E.    GE knew about the hazards of asbestos and did not warn users like Mr. Hultner of those hazards.**

GE has known about the hazards of asbestos going back to at least the 1930s, when, for example, it wrote to the Harvard School of Public Health to boast of its asbestos knowledge. (**Ex. 9**, GE 5042.) By 1972, GE was warning some of its customers regarding the hazards of asbestos in its products. (See, e.g., **Ex. 10**, GE 5607.) Also in 1972, GE declined to take action regarding asbestos associated with its steam turbines because the "lawyers have told them that their exposure is minimal since…the primary responsibility would rest with the General Electric customer." (**Ex. 11**, GE 5198.)

Mr. Hultner testified that he did not see any warnings regarding asbestos on any equipment or received any warnings from equipment manufacturers. (**Ex. 2**, Hultner Depo., p. 67:5-22.) Mr. Hultner testified that if he knew about the hazards of asbestos and was warned about the hazards of asbestos, he would have utilized safety equipment such as a face mask. (*Id*. at p. 338:15-22.)

Mr. Burt, GE's Rule 30(b)(6) witness, testified that there was no warning or statement cautioning that asbestos would pose a hazard on marine or navy turbines. (**Ex. 4**, Burt Depo., p. 36:22-37:4; 37:18-38:2.) The technical manual associated with the GE turbines similarly did not indicate any warnings regarding the hazards of asbestos. (**Ex. 4**, Burt Depo., p. 37:18-38:2.)

**F.    Navy Regulations Required, Rather Than Prohibited, Manufacturers to Warn.**

Adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products. (**Ex. 1**, Moore Report p. 33, 53, 57-58.) The Navy required equipment manufacturers to include safety precautions in their equipment instruction books even before Mr. Hultner began serving in the Navy. (*Id*. at p. 53-54.) In 1936, Bureau of Engineering, Navy Department, required manufacturers to provide safety precautions in their Instruction Books. (*Id*. at p. 53.) The Military Specification MIL-B-15071 (SHIPS) dated April 1950 and the succeeding Military Specifications, MIL-B-15071A (SHIPS) dated October 1952 and MIL-T-15071B (SHIPS) dated April 1954, required safety notices for special hazards involved with products and precautions to be identified and for new pages to instruction manuals to be added for hazard warnings if hazards become known after the manual has been shipped. (*Id*. at p. 53-54.) Military Specifications MIL-M-15071C (SHIPS) issued in September 1957 required the use of emphatics in warnings, and required warnings for operating procedures or practices that would result in personnel injury or loss of life. (*Id*. at p. 54.) These were the same requirements in MilSpecs MIL-M-15071D (SHIPS) issued in 1961. (*Ibid*.) Thereafter, in MilSpecs MIL-M-15071E issued in 1962, the General Specifications also required safety

precautions for installation instructions during equipment unpacking, handling, and installation. (*Ibid.*)

## III.    <u>LEGAL ARGUMENT</u>

**A.    Summary Judgment is a Drastic Measure that Must be Narrowly Construed.**

Summary judgment is only properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (Fed. R. Civ. P. 56(a).) To establish the absence of a "genuine dispute as to any material fact," the movant must "foreclose[] the possibility" that absent countervailing evidence the nonmoving party can prove its case. (*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1979).)

In weighing the sufficiency of the movant's evidence, the inferences drawn from the facts are construed against the movant. (*Sommer v. Hilton Hotels, Corp.*, 376 F.Supp. 297 (S.D.N.Y. 1974); *Society of the N.Y. Hosp. v. Ass'd Hosp. Service of N.Y.*, 367 F.Supp. 149 (S.D.N.Y. 1973).) Even where the evidentiary facts are undisputed, summary judgment must be denied if the inferences drawn from the facts are disputed. (*Hunt v. Cromartie*, 526 U.S. 541 (1999); *Am. Manufacturers Mutual Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir. 1967).)

**B.    Under *DeVries*, GE had a duty to warn users of the hazards of asbestos associated with its products.**

There is no question that a manufacturer is responsible for its own products it places into the stream of commerce. (*Air & Liquid Systems Corporation v. DeVries*, 139 S.Ct. 986, 993 (2019).) However, additional questions arise "when the manufacturer's product requires later incorporation of a dangerous part in order for the integrated product to function as intended." (*Ibid*.)

The United States Supreme Court has recently looked at just these situations in an asbestos case applying maritime law. In *DeVries*, which was a 9-3 decision in an asbestos case very similar to this one involving many of the same defendants, the Court ruled:

> In the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

(*DeVries*, 139 S.Ct. at 995.) Here, Plaintiffs have evidence of all three prongs of the *DeVries* test.

### 1.    GE's equipment required incorporation of asbestos-containing parts.

The Supreme Court explicitly noted several situations which would satisfy the "requirement" prong:

> Courts have determined that this rule applies in certain related situations, including when: (i) a manufacturer directs that the part be incorporated; (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part; or (iii) a product would be useless without the part. In all of those situations, courts have said that the product in effect requires the part in order for the integrated product to function as intended. We agree.

(*Id*. at p. 995-996, citations omitted.)

The GE plans for turbines manufactured during that time period specified the use of asbestos sheet gaskets and metallic-asbestos gaskets, asbestos insulating pads, and asbestos insulation spacers. (**Ex. 1**, Moore Report, p. 35.) Consistent with those plans, Captain Moore stated that the flange bolts for the turbine casing would have originally been asbestos felt and asbestos cloth because it was the only product used for that application. (*Ibid*.) GE was well aware that the turbines would be insulated, evidenced by several GE plans that stated "lagging clips to be supplied & tack welded to casing." (*Id.* at p. 27.) GE thus directed that these asbestos-containing parts be incorporated, satisfying the first prong.

These parts contained asbestos through the time Mr. Hultner served in the Navy, and for some applications until much later. The most of the insulation on Navy nuclear powered submarines, including the insulation on turbines, was asbestos through 1975, with undamaged asbestos insulation remaining on the ships beyond that date. (**Ex. 1**, Moore Report, p. 22-23.) Even in 1990, a letter written by GE stated that "the industry has developed a variety of non-asbestos replacements but none are exact substitutes. Typically, the non-asbestos products cannot be directly substituted for the asbestos gaskets. . ." (*Id.* at 22.) Thus, the turbines required asbestos insulation, again satisfying the first prong.

    **2.**    **GE had reason to know that the integrated product was dangerous during its intended maintenance and use.**

As to the second prong, GE has known about the hazards of asbestos since at least the 1930s. (**Ex. 9**, GE 5042; *see supra* Part II.E.) GE thus had "reason to know" (*DeVries*, 139 S.Ct. at 995) that the incorporated asbestos parts were dangerous well before Mr. Hultner's service in the Navy, and even before it supplied the turbine for the ship.

**3.    GE had no reason to believe that users like Mr. Hultner would realize the danger.**

There is no evidence that Mr. Hultner was aware or should have been aware of the hazards of asbestos while serving in the Navy. In fact, during his service, Mr. Hultner was never warned about asbestos and did not see any warnings concerning asbestos. Moreover, this case is unique because GE itself had representatives that ***saw firsthand*** that Mr. Hultner and the Navy were unaware of the dangers, as they observed work being done on the GE turbine where no precautions were being taken as to the hazards of asbestos. Due to the ongoing and continuous relationship that GE had with the Navy, and its visit and inspections, it knew that proper precautions were not being taken.

Further, at the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. (**Ex. 1**, Moore Report, p. 50.) The Navy also did not consider asbestos in packing and gaskets as a hazard and only started changing their minds throughout the 1970s. (*Id.* at p. 50-51, 56.) In fact, the Navy did not start

seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. (*Id.* at p. 56.)

### C. GE's failure to warn or otherwise take action caused Mr. Hultner to be exposed to asbestos.

GE argues that there is no warning it could have put on the actual turbine that would have prevented Mr. Hultner's injury. However, GE could have put a warning in the instruction book that was provided with its turbine, as adding warning labels to machinery and equipment supplied to the Navy was easily accomplished. (**Ex. 1**, Moore Depo., p. 33.) It could have taken advantage of the ongoing relationship that it had with the Navy to warn them of the dangers of using asbestos products with its equipment. The GE representatives that ***actually saw*** the sailors being exposed and not taking precautions could have said something to Mr. Hultner or other individuals at the Navy.

The Court simply cannot declare as a matter of law that if GE had done all or even any of these things, that Mr. Hultner would still have been exposed to asbestos from GE's equipment. Mr. Hultner testified that if he knew about the hazards of asbestos and was warned about the hazards of asbestos, he would have utilized safety equipment such as a face mask. (**Ex. 2**, Hultner Depo., p. 338:15-22.)

### D. Exposure to asbestos from GE turbines was a substantial factor in causing Mr. Hultner's mesothelioma.

Under Maritime Law the plaintiff needs not prove that exposure to any particular product was the only cause, but merely must prove that (1) he was exposed to the

defendant's product, and (2) such exposure was a substantial factor among the total amount of exposure. (*McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1176 (9th Cir. 2016), relying on *Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488 (2005), abrogated on other grounds by *Air & Liquid Systems Corporation v. DeVries*, 139 S.Ct. 986 (2019).) A "minimal exposure" to a defendant's product is insufficient to establish causation. (*Lindstrom*, 424 F.3d at 492.) "Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." (*Ibid*.) Rather, the plaintiff must show "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." (*Ibid*., quoting *Harbour v. Armstrong World Indus., Inc*., 932 F.2d 968 (6th Cir. 1991).)

In *Lindstrom*, the plaintiffs failed to establish causation because the plaintiffs' expert merely said, "that every exposure to asbestos, however slight, was a substantial factor in causing Lindstrom's disease." (*Lindstrom*, 424 F.3d at p. 493.) Similarly, in *McIndoe*, the plaintiffs' causation expert "did not speak to the severity of McIndoe's own asbestos exposure beyond the basic assertion that such exposure was significantly above ambient asbestos levels." (*McIndoe*, 817 F.3d at p. 1177.) In *McIndoe*, the defendants were shipbuilders and it was undisputed that they were not responsible for any replacement insulation, so what was at issue was whether the insulation the decedent was exposed to was original to the ship. (*McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1172-74 (9th Cir. 2016).) The court described the plaintiffs' "rather implausible" exposure evidence:

> The only direct evidence presented to support the claim that such [original] insulation was removed in McIndoe's presence is the rather implausible testimony of [two shipmates] that, nearly 50 years later, they recall the thickness of the paint on the removed insulation to such a degree that they can surmise the age of the insulation.

(*Id.* at p. 1176.) The only evidence put forth by the plaintiffs of substantial factor causation was a declaration saying "every exposure" to asbestos above background contributed to the disease, and there was no evidence concerning the amount of asbestos exposure from *originally* installed asbestos. (*Id.* at p. 1177.)

In *Cabasug v. Crane Co.*, 989 F.Supp.2d 1027 (D. Haw. 2013), decided before *McIndoe*, after a lengthy analysis and history of causation standards in asbestos cases, the District Court declined to apply the more lenient Washington causation standard requested by the plaintiffs and instead analyzed the plaintiff's exposure to asbestos in the Navy under *Lindstrom*, the standard which was later adopted by the Ninth Circuit in *McIndoe*. (*Id.* at p. 1033-37.) After reviewing numerous cases around the country that applied the *Lindstrom* standard, the District Court gave examples of what would satisfy the standard:

> For example, evidence that Cabasug worked on a vessel in which a Defendant's products were present, on its own, is insufficient to raise a genuine issue of material fact that Cabasug was exposed to such products. ***Plaintiffs may, however, raise a genuine issue of material fact by presenting direct evidence that Cabasug worked on (or, depending on the particular fact, near) the asbestos-containing components of specific products. Alternatively, Plaintiffs may present circumstantial evidence of exposure by presenting evidence that the Defendant's products were prevalent on the vessels on which Cabasug worked and that Cabasug regularly worked on those types of products.*** In this latter case, evidence of regarding [sic] the prevalence of a Defendant's product, combined with evidence of

> Cabasug's regular duties, may support the reasonable inference that Cabasug worked on a particular product. Under either alternative, however, the court rejects Defendants' arguments that Plaintiffs must present direct evidence that Cabasug recalled working on a particular product by the Defendant and recalled the particular vessel upon which it was installed.

(*Id.* at p. 1037-38 [emphasis added].) The District Court expressly rejected the argument that the plaintiffs' evidence amounted to a conclusory "every exposure" argument. (*Id.* at p. 1051, fn. 16.)

Plaintiffs herein have provided much more substantial evidence than in *McIndoe*, and even more than in *Cabasug*. As detailed above, Mr. Hutlner's mesothelioma was caused by exposure to asbestos-containing products and components, including turbines manufactured by GE. Mr. Hultner testified that during an overhaul of the main propulsion turbines aboard the John Adams, he and other shipmates worked in close proximity to the turbines. (**Ex. 2**, Deposition of Plaintiff Scott L. Hultner ["Hultner Depo"] p. 954:12-955:17.) Mr. Hultner testified that he worked within 6 or 7 feet of the turbines and throughout the engine room while this overhaul took place. (*Id.* at 955:3-17.) Mr. Hultner added that insulation blankets had to be removed to open the turbine casings while he was working in the area. (*Id.* at p. 956:2-15.) Mr. Hultner further described "field days" as cleanup days where the sailors would wipe down everything in the John Adams to get rid of all the dust. (*Id.* at p. 958:5-15.)

Mr. Hultner's shipmates on the John Adams, Dale Armbrister and Roy Haile, corroborated Mr. Hultner's testimony, confirming that they observed dust from work with

GE's asbestos-containing materials. (**Ex. 3**, Armbrister Depo, p. 11:8-20; 12:5-12; 46:22-52:2.; **Ex. 12**, Haile Depo., p. 9:6-8; 39:9-42:24.)

Plaintiffs' industrial hygienist Dr. Spear will testify that gasket exposure studies conducted by the Navy in the 1970s showed that removing asbestos gaskets exceeded the OSHA permissible exposure limits in place at the time. (**Ex. 5**, Spear Report, p. 49.) He will also provide testimony that airborne asbestos fibers generally settle from the air very slowly by normal air currents or worker activities, and even settled fibers can easily be re-suspended by sweeping up the area. (*Id*. at p. 59-60.) He will testify that removal of asbestos insulation can result in significant exposures, (*Id*. at p. 53-54, 57-58), and that removal of asbestos blankets results in exposures of 1.4 to 3.0 million parts per cubic foot. (*Id*. at p. 53-54.)

Dr. Brody and Dr. Staggs will testify that mesothelioma is a dose-response disease, where the greater the dose the greater the chance of developing it, and that even low levels of exposure can result in disease for certain unfortunate individuals.

This is more than the bare "every exposure, no matter how small" evidence that was presented in *McIndoe*, and is sufficient for a jury to conclude that exposure to asbestos from GE products was a substantial factor in the development of Mr. Hultner's mesothelioma.

**E.    The cases GE cites do not match the facts of this case.**

Defendant GE cites to *Warrington v. 3M Co.* (E.D. Pa., Aug. 15, 2023, Civil Action 21-cv-03207), in which summary judgment was granted in favor of General Electric.

However, in *Warrington*, the plaintiff worked at a Naval shipyard from 1980 to 1994, at a time when the Navy had already implemented asbestos controls: "asbestos work was conducted in containment areas marked with plastic sheets and duct tape," plaintiff wore a mask, and all new insulations were asbestos free due to the Navy's prohibition of new asbestos insulation many years prior in 1971. (*Id.* at p. 5.) The plaintiff alleged exposure from gaskets on the GE equipment and expressly disclaimed exposure based on thermal insulation, but failed to show that GE had made or supplied any gaskets on its turbine, finding that "no reasonable jury could conclude from the evidence that Mr. Warrington was exposed to asbestos from gaskets manufactured or supplied by GE." (*Id.* at p. 12.) Here Plaintiffs have both exposure to thermal insulation as well as evidence that GE specified asbestos gaskets on its turbine.

In *Rogers v. A.O. Smith Corp.* 602 F. Supp. 3d 748 (E.D. Pa. 2022), another case that Defendant GE has cited in which a court ruled in favor of General Electric, the court granted summary judgment where the plaintiff "failed to produce sufficient evidence for a jury to conclude that he was exposed to an potentially asbestos-containing [turbine] manufactured by General Electric at all, let alone to such an extent that the exposure was a substantial factor in causing his injury." (*Id.* at p. 761.) The plaintiff in *Rogers* was unable to provide evidence to show that the GE turbine required the use of asbestos insulation; the Navy MilSpecs required that "all Naval turbines be delivered "bare metal" and insulation to be furnished by the Navy's shipbuilder. (*Ibid.*) This was similarly the issue in the case of *Sullivan v. A.W. Chesterton Co.*, No. 18-3622, 2022 WL 1013428, at

*1 (E.D. Pa. Apr. 1, 2022) where plaintiff was unable to show that the GE turbine required the use of asbestos insulation. (*Sullivan* at *39.) The plaintiff in *Sullivan* referred to testimony and specifications based on non-Navy uses, evidence which the court considered as having little relevance, and for a turbine on a Navy ship that was specified by the Navy to be delivered without insulation, and to be later insulated by the Navy shipbuilder. (*Ibid*.)

The issues in *Rogers* and *Sullivan* are clearly distinct from this case because the specifications for insulation of the turbines by the shipbuilder was deferred to GE instead of the shipbuilder and the turbines did require the use of asbestos insulation and asbestos-containing components. Moreover, Plaintiffs here have evidence of an ongoing and continuous relationship between GE and the Navy, with GE providing field engineers to inspect the equipment and provide guidance, as well as the sale of replacement parts from GE to the Navy.

## F.    Plaintiffs' Claims Against GE are not Preempted by Government Contractor Immunity.

Defendants have the burden of proving all of the elements of their affirmative defenses, including the government contractor defense.

GE moves for summary judgment under *Boyle*. However, *Boyle* is a state preemption case, and it is inapplicable to federal maritime claims. (*Elorreaga v. ViacomCBS Inc.* (9th Cir., Oct. 3, 2024, No. 23-16041) 2024 WL 4379732, at *1; see also *Boyle* 487 U.S. at 504 [noting that "a few areas, involving 'uniquely federal interests' …

are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary … [by] so-called 'federal common law.' "] [internal quotations omitted].)

Instead, Defendants' government contractor defenses are governed by *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940). (*Elorreaga* 2024 WL 4379732, at *1; see also *Campbell-Ewald Co. v. Gomez,* 577 U.S. 153, 167 n.7 (2016); *McKay v. Rockwell Intern. Corp.,* 704 F.2d 444, 447 n.1, 448 (9th Cir. 1983) [noting that the "government contractor defense" was "first articulated by the Supreme Court in *Yearsley*," and applied in a case where "the relevant law is the same under general maritime law as under the Death on the High Seas Act."].)

Under *Yearsley*, a government agent cannot be held liable for acting under authority "validly conferred" to it by the government. (*Yearsley*, *supra*, 309 U.S. at p. 20-21.) Largely overlapping with *Boyle*, *Yearsley* "is limited to cases in which a contractor had 'no discretion in the design process and completely followed government specifications.'" (*Cabalce v. Thomas E. Blanchard & Associates, Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) [quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008)].)

Defendants' attempt at invoking the government contractor defense fails because Navy specifications at the time required warnings and: (1) there is no evidence that the government prohibited Defendants from warning regarding the hazards of asbestos; and (2) during the relevant time period, the Navy erroneously did not consider asbestos a hazard.

1.    **Defendants' government contractor affirmative defense fails under both Boyle and Yearsley because Defendants' equipment did not conform to the Navy specification requiring them to warn of hazards of their products.**

Placing warnings on equipment sold to the Navy was easily accomplished and the Navy required, rather than prohibited, equipment manufacturers to warn of the hazards of their products. (*See supra* Part II.F.)

Despite these requirements, it is undisputed that GE did not provide any warnings.

The former asbestos MDL in the Eastern District of Pennsylvania determined that asbestos defendants similar to those herein were not entitled to summary judgment based on the government contractor defense in part because there was no evidence that the Navy ever prohibited manufacturers from placing warnings on products and there was conflicting expert evidence regarding whether the defendants could warn. (*Willis v. BW IP Int'l Inc.*, 811 F. Supp. 2d 1146, 1155-57 (E.D. Pa. 2011).) In *Duenas v. Gen. Elec. Co.*, MDL No. 875, No. 12-60040, 2014 WL 345232 (E.D. Pa. 2014), again in the former asbestos MDL, Judge Robreno stated that MIL-M-15071D "can be construed to indicate that the Navy not only permitted but expressly required warnings." (*Id.* at Section II(C).)

2.    **Defendant's government contractor defense fails because the Navy did not consider asbestos to be a hazard during the relevant time period.**

Defendant's government contractor defense fails because at the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their

equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Plaintiffs' expert, Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975, and did not consider asbestos in gaskets as a hazard until the late 1970s. (**Ex. 1**, Moore Report, p. 50-51, 56.)

### G.    Partial summary judgment as to loss of consortium and punitive damages should be denied.

Defendant's assertions regarding loss of consortium and punitive damages is based off of a misreading of recent Supreme Court precedent, including *Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019). After discussing recent cases, *Batterton* lays out the three part test to determine whether certain damages are available in maritime cases:

> In accordance with these decisions, we consider here whether punitive damages have traditionally been awarded for claims of unseaworthiness and whether conformity with parallel statutory schemes would require such damages. Finally, we consider whether we are compelled on policy grounds to allow punitive damages for unseaworthiness claims.

(*Batterton*, *supra*, 139 S. Ct. at 2283.)

The first step is to look at the history. In *Townsend,* the Supreme Court instructs that punitive damages have been available in general maritime claims for centuries, long before the Jones Act was ever enacted by congress. (*Townsend*, 557 U.S. at 414-15.) *Townsend* found punitive damages available for various maritime torts stretching back to the 1800s, including "marine trespass," "marine torts," and other actions against vessel owners on behalf of passengers and seamen, so long as the facts showed "tortious acts of

a particularly egregious nature." (*Id.* at 411-12 [collecting cases allowing punitive damages under general maritime law as early as 1818].)

Ninth Circuit authority confirms what was declared by the Supreme Court in *Townsend*: that punitive damages have long been available for egregious conduct and wanton recklessness under general maritime law. (See, e.g., *In re the Exxon Valdez* 270 F.3d 1215, 1226 (9th Cir. 2001) [collecting cases as early as 1818, including *CEH, Inc. v. F/V Seafare*,70 F.3d 694, 699 (1st Cir. 1995) ["Although rarely imposed, punitive damages have long been recognized as an available remedy in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard of the rights of others."], and *The Amiable Nancy*, 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456 (1818), and others].)

Given the historical availability of punitive damages in negligence claims under general maritime law, they would only be unavailable if a congressional enactment restricted the availability of punitive damages for such claims. (*Batterton*, 139 S.Ct. at 2283 [if historically available, then court must determine whether any statute explicitly precludes the requested relief].)

That was the showing made in *Batterton* for unseaworthiness claims, and it was the showing made in *Miles* for wrongful death claims based on unseaworthiness. However, after looking at the history, *Townsend* examined congressional statutory enactments and found nothing in the Jones Act that precluded an award of punitive damages in a maintenance and cure case. (*Id.* at 418.) "In order to abrogate a common-law principle,

the statute must speak directly to the question addressed by the common law…" (*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 (2008), citing *U.S. v. Texas*, 507 U.S. 529, 534 (1993).) There is no such statute that speaks directly to the question already addressed by common law: punitive damages are available in a general maritime negligence case.

Plaintiffs anticipate that Defendants' argument will be primarily based on an analysis of the Jones Act and the Death on the High Seas Act ("DOHSA"). Theses statutes have no preemptive effect because they do not apply to this case, as Plaintiffs are not making either a Jones Act or a DOHSA claim. These statutes do not override common law maritime principles in other types of claims that have been in place for hundreds of years.

Turning to public policy, the public policy benefit is not deterrence to other manufacturers of asbestos products. The public policy benefit is deterrence to other manufacturers that are right now considering ignoring the safety of their products in search of higher profits. Deterrence in a case like this, when an individual only realizes he has been harmed decades after exposure, is even more important, because a manufacturer could easier justify the use of dangerous products that would only result in speculative legal actions decades down the road, when fading memories would mean fewer consequences.

Many district courts have recently come to the same conclusion in similar cases. (See, e.g., *Cook v. Foster Wheeler Energy Corp.*, 1:21-cv-11362-ADB *5-6 (D. Mass. Sep. 1, 2023) [finding that maritime law permits recovery of punitive damages as to Foster Wheeler in a Navy asbestos case]; *Pelton v. John Crane, Inc.*, 1:21-cv-4316 *17-18 (N.D.

Ill. Jan. 31, 2024) [punitive damages available under maritime law in Navy asbestos case]; *Pritt v. John Crane Inc.*, No. 20-cv-12270, 2023 WL 4471825, at *3-8 (D. Mass. July 11, 2023); *Pritt v. Air & Liquid Sys. Corp.*, No. 19-cv-10651, 2022 WL 902684, at *18 (S.D.N.Y. Mar. 28, 2022) [finding that maritime law permits recovery of punitive damages from alleged exposure to asbestos on a Navy ship].)

The undersigned counsel of record for Plaintiffs Scott L. Hultner and Geraldine E. Hultner, certifies that this brief contains 6949 words, which complies with the word limit of L.R. 11-6.1.

DATED: April 11, 2025                      FROST LAW FIRM, PC


                                           */s/ David White*

                                           DAVID WHITE
                                           Attorney for Plaintiffs

# CERTIFICATE OF SERVICE

I declare that I am over the age of 18, not a party to the above-entitled action, and am an employee of Frost Law Firm PC whose business address is 273 West 7th Street, San Pedro, California 90731.

On April 11, 2025, I served the following document(s) in the following manner(s):

**PLAINTIFFS' OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMMARY JUDGMENT**

on the following:

## ALL COUNSEL OF RECORD

☒    (By CM/ECF) By transmitting electronically via CM/ECF the document(s) listed above as set forth on the electronic service list on this date before 11:59 p.m.

☐    (By E-Service.) I electronically served the document(s) via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

☐    (By E-mail) On this date, the above-referenced documents were converted to electronic files and e-mailed to the addresses shown.

☒    (Federal) I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on April 11, 2025.

*/s/ Lane Legg*
_____
An Employee of Frost Law Firm, PC