SCOTT L. FROST, ESQ., CA Bar No. 258063
scott@frostlawfirm.com
ANDREW SEITZ, ESQ. CA Bar No. 273165
andrew@frostlawfirm.com
DAVID WHITE, ESQ., CA Bar No. 357055
dwhite@frostlawfirm.com
**FROST LAW FIRM, PC**
273 West 7th Street
San Pedro, CA 90731
Tel.: (866) FLF-MESO
Fax: (833) FLF-MESO

and

JOHN M. CARON, ESQ., CA Bar No. 130633
**THE LAW OFFICES OF WORTHINGTON & CARON, PC**
273 W. 7th Street
San Pedro, CA 90731
Tel.:(310) 221-8090
Fax.: (310) 221-8095

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| **SCOTT L. HULTNER** and **GERALDINE E. HULTNER,**<br><br>                Plaintiffs,<br><br>   vs.<br><br>**AIR & LIQUID SYSTEMS CORPORATION** (*sued individually and as successor-in-interest to* BUFFALO PUMPS, INC.), et al.<br><br>               Defendants. | CASE NO. 8:24-cv-00409-JLS-DFM<br><br>**PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     May 2, 2025<br>Time:    10:30 a.m.<br>Courtroom: 8A<br>Judge:   Hon. Josephine L. Staton |

Trial Date: TBD
Complaint Filed: February 27, 2024

SCOTT L. HULTNER and GERALDINE E. HULTNER ("Plaintiffs"), hereby submit the following Responses to Defendant General Electric Company's ("GE") Separate Statement of Uncontroverted Facts and Supporting Evidence in support of Motion for Summary Judgment:

**ISSUE I:** Plaintiffs cannot establish that Mr. Hultner was ever exposed to any respirable asbestos dust attributable to GE, let alone that any such exposure was a substantial factor in causing Mr. Hultner's injury. See, e.g., McIndoe v. Huntington Ingalls Inc., 817 F.3d 1170 (9th Cir. 2016); cf. Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953 (1997).

| **DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE** |
|---|---|
| **PLAINTIFF HULTNER'S NAVY SERVICE** | |
| 1. Plaintiff entered the U.S. Navy on or around March 11, 1971 and was discharged on January 13, 1978.<br><br>Evidence: Depo. of Pl. Scott L. Hultner, Vol. 1, taken Aug. 5, 2024 ("Hultner Depo., Vol. 1"), attached as Exhibit A at 21:2–22:7. | 1. Undisputed for purposes of this motion. |
| 2. Plaintiff understood his service aboard a Navy warship was part of the national defense of the United States, and he served while the U.S. fought the Vietnam war. All sailors had to do their part to ensure the ship was operational and mission capable. | 2. Undisputed for purposes of this motion. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 151:22–152:16. | |
| 3. The chain of command is important in the Navy; personnel assigned above a sailor ensure the sailor performs work correctly and in a safe manner.<br><br>Evidence: Depo. of Roy Haile, Vol. 2, taken Mar. 12, 2025 ("Haile Depo., Vol. 2"), attached as Exhibit C at 107:6–8; 109:7–15. | 3.  DISPUTED to the extent that this implies GE had no duty towards Mr. Hultner. |
| 4. While in the Navy, Plaintiff always took direction from Navy personnel above him and performed his work to Navy standards.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 147:13–16. | 4.  Undisputed for purposes of this motion. |
| 5. Fact: Aboard a Navy ship, the first priority is the mission, the second is the ship, and the third is the personnel.<br><br>Evidence: Haile Depo., Vol. 2, attached as Exhibit C at 170:24–171:12. | 5.  Undisputed for purposes of this motion. |
| 6. Plaintiff attended Navy boot camp in San Diego from March 11 to June 3, 1971 where he learned about Navy discipline and the chain of command; was taught to follow orders; and understood the Navy controlled his life. There is no evidence Plaintiff was exposed to asbestos at Navy boot camp.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 127:15–131:22. | 6.  Undisputed for purposes of this motion. |
| 7. Plaintiff attended Machinists Mate "A" school at Great Lakes from June 19 to October 8, 1971, and studied the Navy Machinists Mate manual; there is no evidence Plaintiff was exposed to asbestos at "A" school. | 7.  Undisputed for purposes of this motion. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 132:1–135:15. | |
| 8. Plaintiff was assigned to the USS Juneau (LPD-10) from November 17, 1971 to January 31, 1972.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 138:8–13. | 8.  Undisputed for purposes of this motion. |
| 9. Plaintiff is unaware of any turbine, drive pump, or fire pump maintenance performed on the USS Juneau and did not personally work on any electrical equipment aboard ship.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 148:15–149:21, 150:12–16. | 9. **Disputed.**<br><br>Plaintiff testified that fire pump and drive turbine maintenance was repaired by M division aboard the Juneau. Plaintiff further testified that his cross training on the Juneau involved preventative maintenance on a wide variety of equipment, including various pumps.<br><br>Evidence: GE Ex. B at 148:23-149:5; **Ex. 1**, Moore Report at p. 4. |
| 10. Plaintiff attended the Navy's nuclear school at Mare Island between February 21 and August 18, 1972. Following Mare Island, Plaintiff attended the Navy's nuclear reactor operator school in Idaho Falls to qualify as a Navy nuclear propulsion operator.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 153:13–20, 156:16–157:13. | 10.  Undisputed for purposes of this motion. |
| 11. The Idaho Falls nuclear Navy training school was operated by the U.S. Navy and the U.S. Atomic Energy Commission (AEC). | 11. Undisputed for purposes of this motion. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 158:24–159:2. | |
| 12. The AEC consistently inspected activity at Idaho Falls; AEC inspectors provided the results of their inspections with Navy engineering officers, who then shared that information with Plaintiff.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 166:19–167:8. | 12. Undisputed for purposes of this motion. |
| 13. Plaintiff did not recall any repair or maintenance on or around a turbine or ship's service turbine generator (SSTG) at Idaho Falls.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 168:8–12. | 13. Undisputed for purposes of this motion. |
| 14. Plaintiff boarded the USS John Adams (SSBN-620) on April 6, 1973 and left on January 13, 1978.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 179:4–7. | 14. Undisputed for purposes of this motion. |
| 15. The Navy and crew of the USS John Adams (SSBN-620) emphasized keeping dust levels low.<br><br>Evidence: Depo. of Dale Armbrister, Vol. 1, taken Dec. 9, 2024 ("Armbrister Depo., Vol. 1"), attached as Exhibit D at 69:7–16. | 15. **Disputed.**<br><br>Disputed to the extent this implies dust was not created or present on the John Adams. Plaintiff, Mr. Armbrister, and Mr. Haile all testified to the creation of dust from GE's equipment aboard the John Adams. Mr. Hultner was responsible for working on everything on the John Adams from the reactor back to the propeller, including but not limited to steam generators, turbine generators, generator oil systems, distilling plants, pumps, valves, all the high-pressure steam equipment, and |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | plant charging valves. Mr. Hultner also stood watches as the engineering supervisor. Hultner testified that he and his shipmates did a ton of maintenance on everything to get it ready to go to sea to ensure there were no problems at sea.<br><br>Evidence: **Ex. 1**, Moore Report, p. 4; **Ex. 2**, Hultner Depo, p. 954:12-955:17; 956:2-15; 958:5-15; **Ex. 3**, Armbrister Depo, p. 46:22-52:2; **Ex. 12**, Haile Depo, p. 39:22-40:5. |
| 16. Every two years Plaintiff was required to successfully complete an Operational Reactor Safeguard Exam to remain qualified for sea duty with the nuclear Navy; Plaintiff's chain of command, specifically the Captain of the USS John Adams (SSBN-620), ensured he prepared for the exam.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 173:6–174:6. | 16. Undisputed for purposes of this motion. |
| 17. The USS John Adams (SSBN-620) underwent a refueling, missile system conversion, and overhaul at Portsmouth Naval Shipyard, N.H between February 1974 and April 1976.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 180:19–181:7. | 17. Undisputed for purposes of this motion. |
| 18. Portsmouth Naval Shipyard had a written safety procedure that applied to the yard and aboard ship.<br><br>Evidence: Haile Depo., Vol. 2, attached as Exhibit C at 70:1–10. | 18. **Disputed.**<br><br>The provisions cited here do not mention a written procedure. Mr. Haile testified that "we didn't have that much on patrol, that much oversight by other people." He then stated that "we did things according to – to procedure, yes." |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Evidence: Haile Depo., Vol. 2, attached as Def. Exhibit C at 70:1–10 |
| 19. The Portsmouth Naval Shipyard inspected for asbestos controls aboard the USS John Adams (SSBN-620) during overhaul.<br><br>Evidence: Portsmouth Naval Shipyard, PTSMH NAVSHIPYD INSTRUCTION 5100.70A, Feb. 11, 1972, attached as Exhibit E; Memo Re: "Removal of asbestos materials; recommendations for" Mar. 27, 1974, attached as Exhibit E-1; Memo., Re: "Removal of asbestos materials; recommendations for May 6, 1974, Exhibits E-1 and E-2. | 19. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Further, GE manufactured the turbines and propulsion reduction gear installed on both the Juneau and the John Adams. GE plan numbers specify the use of nineteen asbestos sheet gaskets and six metallic-asbestos gaskets for each set of propulsion turbines aboard the Juneau. GE plan numbers for these turbines indicate that GE was fully aware that the turbines would be insulated. Aboard the John Adams, GE's main propulsion turbines required a variety of asbestos containing parts as well as asbestos-containing insulation and insulation pads. The main propulsion turbines aboard the Juneau and John Adams would not be removed from the ship during overhauls unless the entire turbine was removed or replaced. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Evidence: **Ex. 1**, Moore Report, p. 27, 34-35, 50-51, 56. |
| 20. Plaintiff admitted that by the time the USS John Adams (SSBN-620) entered the Portsmouth Naval Shipyard for overhaul the concern about asbestos was well known but denied receiving guidance from the Navy on asbestos safety.<br><br>Evidence: Hultner Depo., Vol. 2, Exhibit B at 187:19–188:10. | 20. **Disputed**.<br><br>Mr. Hultner testified that "it was known," rather than well known. Mr. Hultner did not receive warnings from the Navy or from GE. Mr. Haile further testified that he and his fellow sailors aboard the John Adams had no expectation that they could have been harmed by working with GE's asbestos containing equipment.<br><br>Evidence: Hultner Depo., Vol. 2, Def. Exhibit B at 187:19–188:10; Ex. 2, Hultner Depo at 67:5-22; 1007:4-9; Ex. 12, Haile Depo at 43:5-15. |
| 21. AEC inspectors were present aboard the USS John Adams (SSBN-620) during overhaul and their approval was required for larger tasks.<br><br>Evidence: Hultner Depo., Vol. 2, Exhibit B at 167:9–19. | 21. **Disputed.**<br><br>Plaintiff testified that the inspectors were present and their approval was required for "some of the larger tasks."<br><br>Evidence: Hultner Depo., Vol. 2, Def. Exhibit B at 167:9–19. |
| 22. Portsmouth Naval Shipyard personnel performed work during the USS John Adams (SSBN-620) overhaul while Plaintiff and other sailors stood watch.<br><br>Evidence: Hultner Depo., Vol. 2, Exhibit B at 181:12–183:24. | 22. **Disputed.**<br><br>GE representatives were also present for this overhaul. Mr. Hultner and Mr. Armbrister testified that the men continued to work throughout the engine room while this overhaul took place, getting as close at 6 or 7 feet away. At no point did these GE representatives attempt to warn Mr. Hultner nor did these representatives advise Mr. Hultner that he should have been wearing respiratory protection. In |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | fact, Mr. Hultner did not receive any asbestos warnings from any equipment manufacturers.<br><br>Evidence: Ex 2, Hultner Depo, p. 954:12-955:17; 67:5-22; 1007:4-9. Ex. 3, Armbrister Depo, p. 46:22-52:2. |
| 23. Plaintiff concentrated on his own work and was not interested in what Portsmouth Naval Shipyard workers were doing.<br><br>Evidence: Hultner Depo., Vol. 2, Exhibit B at 193:5–17. | 23. **Disputed.**<br><br>Mr. Hultner and Mr. Armbrister testified that the men continued to work throughout the engine room while this overhaul took place, getting as close at 6 or 7 feet away. Insulation blocks had to be removed to open the turbine casing while Mr. Hultner was in the area. The work done on GE's turbines created dust, which Mr. Hultner had to work in, work around, and clean up.<br><br>Evidence: Ex 2, Hultner Depo, p. 954:12-955:17; 956:2-15; Ex. 3, Armbrister Depo, p. 46:22-52:2. |
| 24. Plaintiff recalled Admiral Rickover's visit to the USS John Adams (SSBN-620) during overhaul; acknowledging Rickover's strict and absolute control over every detail related to the nuclear Navy, Plaintiff admitted, "when I saw God [Rickover] coming, I went the other way.".<br><br>Evidence: Hultner Depo., Vol. 2, Exhibit B at 187:1–18. | 24. **Disputed.**<br><br>Disputed to the extent this implies GE had no discretion over its own equipment. GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 25.  During a sea trial after the overhaul, Plaintiff recalled arriving on watch aboard the USS John Adams (SSBN-620) and seeing a Navy Chief Petty Officer and a First Class sailor replacing a gasket on the pipe flange where the ship's main steam connected to the ship's service turbine generator (SSTG).<br><br>Evidence: Hultner Depo., Vol. 2, Exhibit B at 195:9–198:23, 212:9–17. | 25. **Disputed.**<br><br>Plaintiff recalls one instance where a steam leak occurred in GE generators. These generators utilized asbestos containing gaskets. Plaintiff further recalls the repair of this equipment taking around 8 to 10 hours to complete. GE manufactured two generators driven by steam turbines installed aboard the Juneau and the John Adams. These generators utilized asbestos containing gaskets.<br><br>Evidence:  **Ex. 1,** Moore Report, 22, 27-28, 36; **Ex. 2**, Hultner Depo, p. 195:9-19; 196:7-13; 197:14-19. |
| 26. The replacement gasket was pre-cut and not fabricated from a sheet.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 198:19–23, 248:16–249:1. | 26. **Disputed**.<br><br>GE manufactured two generators driven by steam turbines installed aboard the Juneau and the John Adams. These generators utilized asbestos containing gaskets.<br><br>Evidence:  **Ex. 1,** Moore Report, 22, 27-28, 36 |
| 27. Plaintiff never performed work on the turbines aboard the USS John Adams (SSBN-620) and never removed turbine | 27. **Disputed.** |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| blankets. Any turbine work would have been performed by Portsmouth Naval Shipyard personnel.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 199:22–202:6. | GE representatives were also present for this overhaul. Mr. Hultner and Mr. Armbrister testified that the men continued to work throughout the engine room while this overhaul took place, getting as close at 6 or 7 feet away. Further, Mr. Hultner further described "field days" as cleanup days where the sailors would wipe down everything in the John Adams to get rid of all the dust.  Mr. Armbrister testified that he, Mr. Hultner, and the other machinist mates had to work in and around the dust from GE's equipment, including turbines.  Mr. Armbrister described "field day" where he, Mr. Hultner, and their fellow sailors on the John Adams would undertake major cleanup operations on the submarine, exposing the men to dust from the insulating blankets on the turbines.  Another of Mr. Hultner's shipmates on the John Adams, Roy Haile, further described the processes by which he and Mr. Hultner were exposed to dust from GE's equipment.  Mr. Haile testified that he knew the turbine on the John Adams was made by GE because the brand name was on the equipment. Mr. Haile described the dust created from cleaning the equipment during "field days." Mr. Haile further described the blanket covering the turbine as white in color and producing a white dust which the sailor had to clean up. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | This work was all done on the ship, as the main propulsion turbines aboard the Juneau and John Adams would not be removed from the ship during overhauls unless the entire turbine was removed or replaced.<br><br>Evidence: Ex 1, Moore Report, p. 34-35; Ex 2, Hultner Depo, p. 954:12-955:17; 958:5-15. Ex. 3, Armbrister Depo, p. 46:22-52:2. Ex. 12, Haile Depo, p. 39:9-42:24. |
| 28. Plaintiff claimed the Navy never told him about substitutes for asbestos-containing materials aboard the USS John Adams (SSBN-620).<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 211:4–11. | 28. Undisputed for purposes of this motion. |
| 29. Plaintiff wore a Tyvek suit and charcoal respirator provided by the Navy during emergency drills in the USS John Adams (SSBN-620) reactor compartment.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 220:11–221:6. | 29. Undisputed for purposes of this motion. |
| 30. Plaintiff read technical manuals for equipment which the Navy had to approve for use.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 225:14–22. | 30. **Disputed.**<br><br>Plaintiff testified that he did not know whether or not "they were authored by the Navy or they were authored by the manufacturer and approved by the Navy." |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Evidence: Hultner Depo., Vol. 2, attached as Def. Exhibit B at 225:14–22. |
| 31. The Navy had Military Specifications and had to approve equipment before it could be used aboard ship.<br><br>Evidence: Hultner Depo., Vol. 3, attached as Exhibit F at 366:17–367:15, 468:6–15. | 31. **Disputed.**<br><br>Disputed to the extent this implies GE had no control over the design and manufacture of its equipment. GE manufactured the turbines and propulsion reduction gear installed on both the Juneau and the John Adams. GE plan numbers specify the use of nineteen asbestos sheet gaskets and six metallic-asbestos gaskets for each set of propulsion turbines aboard the Juneau. GE plan numbers for these turbines indicate that GE was fully aware that the turbines would be insulated. Aboard the John Adams, GE's main propulsion turbines required a variety of asbestos containing parts as well as asbestos-containing insulation and insulation pads.<br><br>Further, the GE plans for turbines manufactured during that time period specified the use of asbestos sheet gaskets and metallic-asbestos gaskets, asbestos insulating pads, and asbestos insulation spacers. Consistent with those plans, Captain Moore stated that the flange bolts for the turbine casing would have originally been asbestos felt and asbestos cloth because it was the only product used for that application. GE was well aware that the turbines would be insulated, evidenced by several GE plans that stated "lagging |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | clips to be supplied & tack welded to casing."<br><br>Evidence: **Ex. 1**, Moore Report p. 27, 34-35. |
| 32. Plaintiff cannot identify the brand name or manufacturer of electrical equipment aboard the USS John Adams (SSBN-620) he assisted electricians with.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 232:22–233:12. | 32. Undisputed for purposes of this motion. |
| 33. Plaintiff never took directions from a General Electric representative while in the Navy.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 233:22–234:8. | 33. **Disputed.**<br><br>Plaintiff was also never warned by a General Electric representative of the hazards of asbestos.<br><br>Evidence: Ex. 2, Hultner Depo, p. 67:5-22; 1007:4-9. |
| 34. Plaintiff is not an expert on asbestos or an Industrial Hygienist and never received training on asbestos detection.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 247:22–25; Vol. 6, attached as Exhibit G at 891:21–24, 924:22–925:3. | 34. Undisputed for purposes of this motion. |
| 35. Plaintiff received repair parts from Navy supply, along with a Planned Maintenance System (PMS) card that contained maintenance and repair instructions.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 250:8–14. | 35. **Disputed.**<br><br>The cited passages make no mention of repair instructions.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Def. Exhibit B at 250:8–14. |
| 36. Plaintiff does not know where replacement parts he received from Navy supply originated; Plaintiff never saw invoices for parts or packaging. | 36. **Disputed.**<br><br>There is no direct evidence that any of the original asbestos parts of the GE |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 255:6–257:4. | equipment aboard the Juneau or John Adams was replaced prior to Mr. Hultner's time on the ships. Moreover, any replacement parts likely came from GE. Mr. Burt testified that GE gave technical advice to users over the lifetime of the turbines. Plaintiffs' expert Captain Moore agrees that it was likely that repair parts were ordered from the original equipment manufacturers. Mr. Hultner also testified that all repair parts used on the machinery on the John Adams had been provided by the original equipment manufacturers and cited that each of the components he used were an exact fit. |

Further, GE's equipment contained asbestos through the time Mr. Hultner served in the Navy, and for some applications until much later. Most of the insulation on Navy nuclear powered submarines, including the insulation on turbines, was asbestos through 1975, with undamaged asbestos insulation remaining on the ships beyond that date. Even in 1990, a letter written by GE stated that "the industry has developed a variety of non-asbestos replacements but none are exact substitutes. Typically, the non-asbestos products cannot be directly substituted for the asbestos gaskets. . ."

Mr. Burt also testified that he was not surprised that handholes and manholes gaskets for the crossover piping would contain asbestos. Mr. Burt testified that asbestos-containing insulation on the

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL
ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | GE turbine was an option that may have been used as it operated at high temperatures.<br><br>**Evidence: Ex. 4**, Burt Depo., p. 42:15-44:4, 46:3-7; 48:10-16, 56:8-59:2; 61:24-62:5; **Ex. 1**, Moore Report, p. 22-23; 44; **Ex. 2**, Hultner Depo., p. 450:19-451:3. |
| 37. Plaintiff did not see respirators used outside of training and did not recall seeing asbestos warning signs aboard ship.<br><br>Evidence: Hultner Depo., Vol. 3, attached as Exhibit F at 333:8–335:7. | 37. **Disputed.**<br><br>Disputed to the extent this omits relevant facts. Additionally, Mr. Hultner testified that he did not see any warnings regarding asbestos on any equipment or received any warnings from equipment manufacturers.<br>Mr. Hultner testified that if he knew about the hazards of asbestos and was warned about the hazards of asbestos, he would have utilized safety equipment such as a face mask.<br><br>Mr. Burt added that there was no warning or statement cautioning that asbestos would pose a hazard on marine or navy turbines. The technical manual associated with the GE turbines similarly did not indicate any warnings regarding the hazards of asbestos.<br><br>Evidence: **Ex. 2**, Hultner Depo., p. 67:5-22; 338:15-22; **Ex. 4**, Burt Depo., p. 36:22-37:4; 37:18-38:2. |
| 38. Plaintiff believes there was a breakdown in the Navy chain of command regarding asbestos health and safety because he does not know that the Navy told him about asbestos health hazards and how to protect | 38. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| against them.<br><br>Evidence: Hultner Depo., Vol. 3, attached as Exhibit F at 337:21–338:11. | parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>At the same time, GE knew about the hazards of asbestos going back to at least the 1930s, when, for example, it wrote to the Harvard School of Public Health to boast of its asbestos knowledge. By 1972, GE was warning some of its customers regarding the hazards of asbestos in its products. Also in 1972, GE declined to take action regarding asbestos associated with its steam turbines because the "lawyers have told them that their exposure is minimal since…the primary responsibility would rest with the General Electric customer."<br><br>Evidence: **Ex. 1**, Moore Report, p. 50-51, 56; **Ex. 9**, GE 5042; **Ex. 10**, GE 5607; **Ex. 11**, GE 5198. |
| 39. Plaintiff never worked on the internal components of a turbine and if any turbine blankets were removed from turbines aboard the USS John Adams (SSBN-620), they would have been limited to blankets around the horizontal flange and removed by Portsmouth Naval Shipyard personnel.<br><br>Evidence: Hultner Depo., Vol. 2, attached | 39. **Disputed.**<br><br>GE representatives were also present for this overhaul. Mr. Hultner and Mr. Armbrister testified that the men continued to work throughout the engine room while this overhaul took place, getting as close at 6 or 7 feet |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| as Exhibit B at 199:8–200:7; Vol. 6, attached as Exhibit G at 1000:6–10. | away. This work created dust, which the men breathed.<br><br>Evidence: Ex 2, Hultner Depo, p. 954:12-955:17. Ex. 3, Armbrister Depo, p. 46:22-52:2. |
| 40. Plaintiff does not know the maintenance history of any turbines aboard the USS John Adams (SSBN-620).<br><br>Evidence: Hultner Depo., Vol. 6, attached as Exhibit G at 997:18–998:1. | 40. Undisputed for purposes of this motion. |
| 41. Plaintiff used vacuum cleaners and wet rags to wipe down equipment aboard the USS John Adams (SSBN-620) and double-bagged used cleaning materials.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 165:20–24; Vol. 6, attached as Exhibit G at 1003:19–1004:2. | 41. Undisputed for purposes of this motion. |
| 42. Plaintiff does not know whether thermal insulation on the USS John Adams (SSBN-620) turbines was original but believes it would have been changed before he boarded based on "common sense."<br><br>Evidence: Hultner Depo., Vol. 6, attached as Exhibit G at 1017:4–1018:6. | 42. **Disputed**.<br><br>Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975.<br><br>Evidence:  **Ex. 1**, Moore Report, p. 50-51, 56 |
| ADMIRAL RICKOVER, FATHER OF THE UNITED STATES' NUCLEAR NAVY | |
| 43. In 1983, the Portsmouth Naval Shipyard installed a bronze likeness of Admiral Hyman G. Rickover with the inscription, "Father of the Nuclear Navy."<br><br>Evidence: U.S. Navy, *The Father of the Nuclear Navy*, ALL HANDS, Dec. 1983, attached as Exhibit H at 11. | 43. Undisputed for purposes of this motion. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 44. Admiral James D. Watkins, at the launching of the attack submarine Hyman G. Rickover (SSN 709), said of the vessel's namesake, "Admiral Rickover was particularly concerned about safety—it was a fundamental consideration in every facet of his program."<br><br>Evidence: ALL HANDS, Dec. 1983, attached as Exhibit H at 10. | 44. Undisputed for purposes of this motion. |
| 45. So great was his contribution to the nuclear Navy, the United States awarded Vice Admiral Rickover two Distinguished Service Medals, the government's highest peacetime award.<br><br>Evidence:  Bill Howard, JO1, U.S. Navy, *Nuclear Subs: The First*, ALL HANDS, Oct. 1964, attached as Exhibit I at 4, see also 2–7. | 45. Undisputed for purposes of this motion. |
| 46. In 1952 then-Captain Rickover informed GE that he was responsible for the entirety of the Mark B nuclear submarine program at KAPL stating, "the responsibility for the design, development, operation, and any other aspects of this plant is vested in me . . . No matter what happens, I hereby accept full responsibility for this vessel."<br><br>Evidence: Letter from Capt. H.G. Rickover to A.E. Potter, GE, Feb. 27, 1952, attached as Exhibit J. | 46. Undisputed for purposes of this motion. |
| 47. Admiral Rickover's control over the nuclear Navy extended to the approval and installation of reactor plants, which could not deviate from prior government approval absent intervention by the Navy's Bureau of Ships. | 47. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: BUSHIPS Instruction 9890.17, May 22, 1964, attached as Exhibit K. | Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.

The Navy required equipment manufacturers to include safety precautions in their equipment instruction books even before Mr. Hultner began serving in the Navy.  In 1936, Bureau of Engineering, Navy Department, required manufacturers to provide safety precautions in their Instruction Books. The Military Specification MIL-B-15071 (SHIPS) dated April 1950 and the succeeding Military Specifications,  MIL-B-15071A (SHIPS) dated October 1952 and MIL-T-15071B (SHIPS) dated April 1954, required safety notices for special hazards involved with products and precautions to be identified and for new pages to instruction manuals to be added for hazard warnings if hazards become known after the manual has been shipped. Military Specifications MIL-M-15071C (SHIPS) issued in September 1957 required the use of emphatics in warnings, and required warnings for operating procedures or practices that would result in personnel injury or loss of life. These were the |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
|  | same requirements in MilSpecs MIL-M-15071D (SHIPS) issued in 1961. Thereafter, in MilSpecs MIL-M-15071E issued in 1962, the General Specifications also required safety precautions for installation instructions during equipment unpacking, handling, and installation.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53-54, 57-58.) |
| 48. In 1967, as Director of the Navy's Division of Naval Reactors, Admiral Rickover issued the Engineering Manual for Naval Nuclear Propulsion Plants "to establish standard requirements for organizing the engineering departments of Navy nuclear powered ships to provide for safe and proper operation of the nuclear power plant." The memo was copied to the Idaho Falls nuclear Navy facility Plaintiff attended.<br><br>Evidence: Memo from H.G. Rickover, Apr. 25, 1967, attached as Exhibit L. | 48. Undisputed for purposes of this motion. |
| 49. In 1970, citing the Sep. 24, 1969 U.S. Navy Project FA-287 Final Report and Proposed NAVSHIPS Instruction 5100, "Control of Asbestos Hazards," Admiral Rickover summarized the potential health hazards associated with asbestos and well known by the Navy, and recommended the Navy require that asbestos removed during ship overhaul be replaced with asbestos-free materials and discontinue the use of high-asbestos content insulation in ship overhauls. | 49. **Disputed**.<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Memo from H.G. Rickover, Sept. 22, 1970, attached as Exhibit M. | Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 50. The Navy responded to Admiral Rickover, concurring with the proposed NAVSHIPS notice to eliminate the use of high asbestos content material for thermal insulation.<br><br>Evidence: Memo from M.E. Miles to NAVSHIPS 08, Re: "Reduction of Asbestos Hazards, Proposed NAVSHIPS Notice; Comments on," Jan. 11, 1971, attached as Exhibit N at 1-2. | 50.  **Disputed**.<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975.  In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 51. Admiral Rickover set the cleanliness standard in the nuclear Navy; Plaintiff learned about this during nuclear Navy training at Idaho Falls.<br><br>Evidence: Hultner Depo., Vol. 6, attached as Exhibit G at 1002:23–1003:1. | **51. Disputed.**<br><br>Disputed to the extent this implies dust was not created or present on the John Adams. Plaintiff, Mr. Armbrister, and Mr. Haile all testified to the creation of dust from GE's equipment aboard the John Adams.<br><br>Evidence: **Ex. 2**, Hultner Depo, p. 954:12-955:17; 956:2-15; 958:5-15; **Ex. 3**, Armbrister Depo, p. 46:22-52:2; **Ex. 12**, Haile Depo, p. 39:22-40:5. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 52. At Idaho Falls Plaintiff learned that dust was "really bad" in the nuclear Navy and first encountered High-Efficiency, Particulate Air (HEPA) filtration systems.<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 165:1–19. | 52. **Disputed.**<br><br>Disputed to the extent this implies dust was not created or present on the John Adams. Plaintiff, Mr. Armbrister, and Mr. Haile all testified to the creation of dust from GE's equipment aboard the John Adams.<br><br>Evidence: **Ex. 2**, Hultner Depo, p. 954:12-955:17; 956:2-15; 958:5-15; **Ex. 3**, Armbrister Depo, p. 46:22-52:2; **Ex. 12**, Haile Depo, p. 39:22-40:5. |
| 53. Plaintiff admitted, "when you're on a sub, dust is bad, water is bad, any leak is bad. Anything that is not supposed to be there is bad so we would continually clean, field day."<br><br>Evidence: Hultner Depo., Vol. 2, attached as Exhibit B at 165:10–13. | 53. **Disputed.**<br><br>Disputed to the extent this implies dust was not created or present on the John Adams. Plaintiff, Mr. Armbrister, and Mr. Haile all testified to the creation of dust from GE's equipment aboard the John Adams.<br><br>Evidence: **Ex. 2**, Hultner Depo, p. 954:12-955:17; 956:2-15; 958:5-15; **Ex. 3**, Armbrister Depo, p. 46:22-52:2; **Ex. 12**, Haile Depo, p. 39:22-40:5. |
| **GENERAL ELECTRIC MANUFACTURED AND DELIVERED "BARE METAL" NAVY TURBINES TO MILITARY SPECIFICATIONS** | |
| 54. Navy turbines are mechanical devices made of steel and other metal alloys. Their purpose is to convert the heat energy contained in steam created by a ship's | 54. Undisputed for purposes of this motion. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| boilers into mechanical energy that can be harnessed to perform useful work.<br><br>Evidence: Burt Affidavit, Apr. 3, 2025, attached as Exhibit O, ¶¶ 2–7. | |
| 55. An integral part of the contracting process for Navy turbines is a collection of U.S. government documents known as Military Specifications. All pertinent Military Specifications were incorporated as part of any government contract between the Navy and GE for Navy turbines. In some situations, the Navy also created additional ship or class specific specifications for Navy turbines that were written directly into the government contract for those turbines.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 8; Military Specification, Turbine, Steam, Propulsion (For Naval Shipboard Use), MIL-T-17600, June 26, 1953, attached as Exhibit P. | 55. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 56. The Navy required turbines manufactured by General Electric comply with strict Military Specifications that established the shipbuilder's responsibility for both thermal insulation and the steam system external to the turbine.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 8; MIL-T-17600, Exhibit P at 17. | 56. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 57. Navy propulsion turbines manufactured by GE comply with strict Military Specifications governing vibration.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 13; MIL-STD-167 (SHIPS), 1954, Exhibit Q at 6; MIL-STD-167-1 (SHIPS), 1974, Exhibit R at 5-7. | 57. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 58. GE was contractually mandated to strictly comply with all applicable Navy specifications for the Navy turbines it manufactured for the Navy. The Navy enforced such strict compliance in various ways, including by retaining approval rights over GE's engineering drawings and by | 58. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware |

25

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| stationing resident Navy machinery inspectors at the factories where Navy turbines were manufactured. Those inspectors had to approve the materials, manufacturing, and testing of GE manufactured Navy turbines for full compliance with the Navy's contractual requirements, including applicable Navy specifications, before the Navy approved those turbines for shipment from the factory to the Navy's shipbuilder.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 8; General Specifications for Machinery, Subsection S39-1, Exhibit S. | that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 59. There were no GE specifications for heat insulation materials used with Navy turbines; that was governed exclusively by Navy Military Specifications.<br><br>Evidence: Burt Affidavit, **Exhibit O**, ¶¶ 9–10; Bureau of Engineering, Navy Department, General Specifications for Machinery, Subsection S39-1, Heat Insulation for Piping and Machinery, Feb. 1, 1939, attached as **Exhibit S**; MIL-I-0016411C, **Exhibit T**; MIL-I-2818A, **Exhibit U**; MIL-C-20079C, **Exhibit V**. | 59. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 60. From GE's engineering perspective, Navy turbines manufactured by GE did not require any heat insulation materials in order to function as designed. After manufacturing was complete, Navy turbines were test run at the GE factory without heat insulation materials, under Navy control and direction, and they did not have any heat insulation materials on them when they left GE's control and were shipped from the GE factory to the Navy's shipbuilder. Navy turbines manufactured by GE left the factory and were shipped "bare metal," meaning that they had only a coat of paint on the exterior metal surface. The Navy required this bare metal shipment because its specifications mandated that its shipbuilders would later furnish and apply any specified heat insulation material after the turbines had been installed aboard ship and tested.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 10. | 60. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 61. The main steam line from the reactor on a nuclear submarine connects to an inlet flange on the Navy turbine. The main steam line and gasket on that flange are provided by the Navy's shipbuilder. The nature and composition of that gasket is governed by the Navy's Military Specifications.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 14. | 61. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its equipment whereby GE specified the use of asbestos components. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 62.  Any heat insulation materials that were applied to Navy turbines manufactured by GE would have been specified by the Navy and furnished and installed at a later time by the Navy's shipbuilder as part of the vessel's construction, in accordance with the Navy's contract with that shipbuilder. Thus, in supplying and installing heat insulation materials on Navy turbines manufactured by GE, the Navy's shipbuilder was required by the Navy to comply with the Navy's Military Specifications for heat insulation materials, such as thermal insulation specification S39-2.<br><br>Evidence:  Burt Affidavit, attached as **Exhibit O**,¶ 9; Bureau of Engineering, Navy Department, General Specifications for Machinery, Subsection S39-1, Heat Insulation for Piping and Machinery, Feb. 1, 1939, attached as **Exhibit S**; Department of the Navy, Bureau of Ships, General Specifications for Ships of the United States Navy, Subsection S39-2, Thermal Insulation and Acoustic Absorptive Treatment for Machinery, Piping, and Ducts, July 1, 1954, attached as **Exhibit W**. | 62. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Additionally, adding warning labels to machinery and equipment supplied to the Navy was easily accomplished and was not prohibited by the Navy; in fact, the Navy required its equipment manufacturers to provide warnings of the hazards associated with equipment delivered to the Navy and the Navy relied heavily upon its equipment manufacturers to identify hazards associated with their products.<br><br>Evidence: (**Ex. 1**, Moore Report p. 27, 33, 35, 53, 57-58.) |
| 63. Shipyard insulation work would have been performed by the shipyard's insulators after those Navy turbines had been delivered to the shipyard, installed aboard ship by the shipyard's union craftsmen, and | 63. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| tested under Navy supervision. In any event, Navy turbines manufactured by GE certainly did not require asbestos-containing heat insulation materials as opposed to non-asbestos heat insulation materials. The Navy permitted its shipbuilders to choose non-asbestos heat insulation alternatives for installation on Navy turbines (whether manufactured by GE or others), and the performance of those turbines was in no way affected by the shipbuilder's choice of materials.<br><br>Evidence:  Burt Affidavit, attached as **Exhibit O**, ¶ 9; Bureau of Engineering, Navy Department, General Specifications for Machinery, Subsection S39-1, Heat Insulation for Piping and Machinery, Feb. 1, 1939, attached as **Exhibit S**; Department of the Navy, Bureau of Ships, General Specifications for Ships of the United States Navy, Subsection S39-2, Thermal Insulation and Acoustic Absorptive Treatment for Machinery, Piping, and Ducts, July 1, 1954, attached as **Exhibit W**. | asbestos insulation would be used. Further, the Navy did not stop in installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation.<br><br>Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| 64.  The Navy specified that Military Specification MIL-I-16411 described an acceptable heat insulation material for use by Navy shipyards on shipboard machinery such as Navy turbines. Military Specification MIL- I-16411 expressly provided for the use of glass fiber thermal insulation for thermal control of machinery and equipment such as steam turbines at temperatures up to 1200°F.<br><br>Evidence: MIL-I-0016411C, Apr. 1, 1965, attached as Exhibit T. | 64. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Further, the Navy did not stop in installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| 65.  The turbines aboard U.S. Navy vessels did not require asbestos insulation in order to function as intended.  As early as the 1930s and well before Plaintiff entered the Navy, the Navy had approved various types of asbestos-free insulation for Navy high temperature applications such as turbines, including aluminum foil, fiberglass, and mineral wool..<br><br>Evidence: Exhibits S, T, U, and V. | 65. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Further, the Navy did not stop in installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation.<br><br>Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| 66.  Turbines and associated equipment supplied to the U.S. Navy for installation aboard Navy ships were supplied "bare-metal," meaning thermal insulation was not supplied or applied by the manufacturer. Any such insulation would have been furnished and applied by the Navy's approved shipbuilder.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 9. | 66. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Further, the Navy did not stop in installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation.<br><br>Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| 67. GE did not supply or install any of the insulation used by the Navy with GE equipment on the Navy Ships. | 67. **Disputed.**<br><br>When the turbines aboard the John Adams required an overhaul, GE |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Burt Affidavit, Exhibit O, ¶ 9. | representatives were present to oversee the maintenance.<br><br>Evidence: (**Ex. 2**, Hultner Depo., p. 954:12-25.) |
| 68.  Any asbestos insulation on the main propulsion turbines aboard U.S. Navy ships would have been specifically required pursuant to precise Navy specifications.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶¶ 9–11. | 68. **Disputed**.<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Further, the Navy did not stop in installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation.<br><br>Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| 69.  At any point during the life of a Navy warship, for any reason that the Navy deems appropriate, the Navy has the ability to change the heat insulation on a Navy turbine and install new heat insulation material of whatever type suits the Navy's purposes at that time. For that reason, it cannot be presumed at any given point during the long lifespan of a Navy warship that the heat insulation then present on a Navy turbine dates back to the original construction of the ship.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 11. | 69. **Disputed.**<br><br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos components and was aware that asbestos insulation would be used. Further, the Navy did not stop installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation.<br><br>Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| 70.  Navy equipment manufactured by GE aboard U.S. Navy ships could have functioned as designed and intended using one of the non-asbestos- containing | 70. **Disputed.**<br>GE had an ongoing relationship with the Navy regarding its turbines whereby GE specified the use of asbestos |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| insulations which had been approved by the Navy, as evidenced by the fact that – as the Navy transitioned to the exclusive use of non-asbestos-containing materials in its repair and maintenance of its ships – GE equipment remained in place and continued to function as intended despite the replacement of any original asbestos-containing insulation with non-asbestos-containing materials.<br><br>Evidence: Burt Affidavit, Exhibit O, ¶ 10. | components and was aware that asbestos insulation would be used. Further, the Navy did not stop in installation of new asbestos insulation until 1975. Most insulation on Nuclear Submarines through 1975 was asbestos-containing insulation. Even after 1975, asbestos insulation remained on many ships.<br><br>Evidence: (**Ex. 1**, Moore Report p. 22-23, 27, 33, 35, 50, 53, 57-58.) |
| **THE UNITED STATES NAVY'S KNOWLEDGE OF ASBESTOS HAZARDS AND SAFETY CONTROLS** | |
| 71. In 1943, the Navy and the U.S. Maritime Commission published minimum requirements for safety and industrial health standards.<br><br>Evidence: *Minimum Requirements for Safety and Industrial Health in Contract Shipyards*, 1943, Exhibit X. | 71. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 72. The Navy and Portsmouth Naval Shipyard were special subscribers of the Transactions of the Industrial Hygiene Foundation, which included many articles pertaining to asbestos. | 72. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Bulletin No. 8, Eleventh Annual Meeting, 1946, Exhibit Y. | Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 73. In 1945 the Navy conducted the first epidemiological study of end users of asbestos-containing products in the United States, which was based on shipyard workers and published in a peer review journal.<br><br>Evidence: *A Health Survey of Pipe Covering Operations*, 1946, **Exhibit Z** at 9; Drinker, Philip, et al., A Health Survey of Pipe Covering Operations in Constructing Navy Vessels, 1945 (draft version), attached as **Exhibit AA**; Dreessen, W.C., A Study of Asbestosis in the Asbestos Textile Industry, United States Public Health Service, Public Health Bulletin No. 241, Aug. 1938, attached as **Exhibit BB**. | 73. **Disputed**.<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 74. The published Fleischer-Drinker Study restated: "Since each of the 3 cases of asbestosis had worked at asbestos pipe covering in shipyards for more than 20 years, it may be concluded that such pipe covering is not a dangerous occupation." The article further noted that "exhaust ventilation and respiratory protection are therefore of value in maintaining this low incidence of asbestosis.".<br><br>Evidence: W. Fleischer, F. Viles, R. Gade | 74. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| and P. Drinker, A Health Survey of Pipe Covering Operations in Constructing Naval Vessels, 28 J. OF INDUS. HYGIENE AND TOXICOLOGY, Jan. 1946, attached Exhibit Z at 15–16 (emphasis added). | packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 75. The Fleischer-Drinker Study contained data from six shipyards, both Navy and contract (civilian), including the Portsmouth Naval Shipyard.<br><br>Evidence:  Drinker, Philip, et al., A Health Survey of Pipe Covering Operations in Constructing Navy Vessels, 1945 (draft version), attached as Exhibit AA at 1, 15. | 75. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 76. The United States Navy and GE were active members and participants of the National Safety Council, and the Navy was a member of the American Industrial Hygiene Association.<br><br>Evidence:  List of National Safety Council publications with GE authors from 1912 to 1968, attached as Exhibit CC; Collection of National Safety Council publications authored by Navy personnel from 1947 to 1977, attached as Exhibit DD; List of U.S. Navy National Safety Council Committee members and participants from 1947 to 1979, attached as Exhibit EE; American Industrial Hygiene Association Membership | 76. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Rosters from 1948 to 1972, attached as Exhibit FF (Full copies of each cited publication available upon request). | Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 77. The National Safety Council ("NSC") cited the U.S. Navy's Safety Review as a recommended authority for health and safety professionals.<br><br>Evidence: NSC Accident Prevention Manual (2nd ed. 1951), Exhibit GG. | 77. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 78. The 1952 Walsh-Healey Act required personal protective equipment and other safety measures when exposures to asbestos exceeded the threshold limit value (TLV).<br><br>Evidence: U.S. Dept. of Labor standards under Walsh-Healey Act, 1952, Exhibit HH. | 78. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 79. In 1955, the Navy adopted the asbestos threshold limit values set forth by the American Conference of Governmental Industrial Hygienists of five-million particles per cubic feet.<br><br>Evidence: BUMED Instructions 6260.3 and 6260.5, Nov. 7, 1955, Exhibit II. | 79. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 80. From the late 1950s through the 1970s the Navy conducted detailed classified health and safety surveys on asbestos hazards aboard ships. The Navy published the results of these surveys in "Occupational Health Hazard Reports" issued quarterly throughout the Navy complex and "treated as manufacturers' 'Discreet' proprietary information, in accordance with SECNAVINST 5570.1A of 6 April 1957." Distribution was limited to Naval establishments, including the Portsmouth Naval Shipyard. In many of these reports the Navy recognized that based upon present technology, exposure levels in ship engine spaces exceeded the applicable TLV, contrary to its findings in Fleischer Drinker report in 1945/46.<br><br>Evidence: Memos from Bureau of Medicine and Surgery, 1960–1962, Exhibits JJ, KK at 59, LL at 29. | 80.<br>. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 81. It was not until 1971 that the Navy for the first time changed its directives regarding asbestos hazards.<br><br>Evidence: NAVSHIPS Instructions 5100.26 (Feb. 9 and 23, 1971), Exhibits MM and NN. | 74. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 82. In 1969, the Naval Ship Engineering Center and Bureau of Medicine conducted an asbestos hazard survey of several U.S. Naval shipyards, including the Portsmouth Naval Shipyard. The subsequent Final Report of Project FA-287 made several safety recommendations, including the replacement of many asbestos materials with non-asbestos counterparts and strict adherence to safety regulations.<br><br>Evidence: Final Report of Project FA-287, Sep. 24, 1969, Exhibit OO. | **82. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 83. In 1968, this country's leading asbestos researcher, Dr. Irving Selikoff, opined that | 83. **Disputed** |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| exposure to insulation work was below the TLV of 5mppcf.<br><br>Evidence: Selikoff, *Asbestos Exposure, Smoking, and Neoplasia*, JAMA, April 8, 1968, Exhibit PP at 108 (excerpt). | Disputed to the extent this implies there is any safe level of asbestos exposure. Plaintiffs' industrial hygienist Dr. Terry Spear will testify that gasket exposure studies conducted by the Navy in the 1970s showed that removing asbestos gaskets exceeded the OSHA permissible exposure limits in place at the time. He will also provide testimony that airborne asbestos fibers generally settle from the air very slowly by normal air currents or worker activities, and even settled fibers can easily be re-suspended by sweeping up the area. He will testify that removal of asbestos insulation can result in significant exposures, and that removal of asbestos blankets results in exposures of 1.4 to 3.0 million parts per cubic foot. Plaintiffs' epidemiology expert Dr. Marty Kanarek will testify that exposures from working with gaskets can lead to an exposure to fibers of 1.7-6.8 fibers/cc, and that just 2 fibers/cc over the course of an 8-hour workday would result in the inhalation of 16,000,000 asbestos fibers of 5 microns in length, and with perhaps billions or trillions of smaller fibers present. Removal of a gasket, including by using a wire brush, results in an exposure dose of 1,700,000 to 11,000,000 asbestos fibers 5 microns in length or over with the possibility of exposure to billions or even trillions of shorter fibers. Moreover, he will also testify that mesothelioma is a dose-response disease where every additional exposure to asbestos leads to a greater risk of mesothelioma. Plaintiffs' expert |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Dr. Arnold R. Brody will testify "that no amount of exposure to asbestos above the background levels present in ambient air has been established as too low to induce mesothelioma." He will further reply that mesothelioma is a cumulative disease in which the more asbestos a person is exposed to, the more likely they will develop the disease. Plaintiffs' causation expert, Dr. Brent Staggs, will opine that there is a dose response relationship between asbestos and the development of malignancy, meaning that the more exposure someone has, the higher the risk of developing disease. Dr. Staggs will also be able to provide support that even low levels of exposure increase the risk for mesothelioma. Additionally, he will opine that many cohorts with relatively little exposure show an increased risk of developing mesothelioma, including family members of workers with asbestos products that bring the dust home on their clothing. Such exposures led the Mr. Hultner's diagnosis of malignant mesothelioma.<br><br>Evidence: **Ex. 1**, Moore Report, p. 4; **Ex. 5**, Spear Report, p. 49, 53-54, 57-60; **Ex. 6**, Kanarek Report, at ¶ 21; 40(c); **Ex. 7**, Brody Report at ¶ 8, 41, 42; **Ex. 8**, Staggs Report, at p. 4-8. |
| 84. In 1968 the Navy concluded that exposure to asbestos gaskets is "not considered to be a significant health hazard." | 84. Undisputed for purposes of this motion. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| Evidence: Memo from Capt. W.R. Riblett, Dec. 9, 1968, Exhibit QQ. | |
| 85. The Portsmouth Naval Shipyard's 1969 industrial hygiene survey for the Commander, Naval Ship Systems Command, acknowledged that asbestos removal could be hazardous and is "scheduled for the first stages of submarine overhaul."<br><br>Evidence: Memo from R.A. Fisichella, Sept. 29, 1969, Exhibit RR at 1. | **85. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 86. The Portsmouth Naval Shipyard conducted air sampling aboard ship during asbestos work and found low airborne dust concentrations and gave annual medical examinations including x-rays for all pipecoverers and insulators.<br><br>Evidence: Exhibit RR at 4. | 86. Undisputed for purposes of this motion. |
| 87. In February 1971, the Navy issued both NAVSHIPS Instruction 5100.26, "Asbestos Exposure Hazards: Control of" and NAVSHIPS Notice 9390, "Asbestos hazards: Reduction of.".<br><br>Evidence: Exhibits MM and NN. | **87. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 88.  The Portsmouth Naval Shipyard received Instruction 5100.26 and, like all Navy medical and safety departments, was required to follow the industrial hygiene precautions therein. NAVSHIPS Instruction 5100.26 and NAVSHIPS Notice 9390 not only identified potential asbestos hazards and banned the use of several forms of asbestos-containing insulation materials; but required all supervisors and workers to follow extensive engineering controls (e.g., ventilation, respirator use, wet-down methods, coveralls, segregation of work areas to prevent contamination) to be followed when handling asbestos-containing materials.<br><br>Evidence:  PTSMH NAVSHIPYD INSTRUCTION 5100.70A, Feb. 11, 1972, attached as Exhibit E. | 88.<br><br>    **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 89.  The Portsmouth Naval Shipyard issued Instruction 5100.70A, specifically applying NAVSHIPS Instruction 5100.26 and NAVSHIPS Notice 9390 to its existing asbestos health and safety program. Notably, Portsmouth instruction 5100.70A applied to "all asbestos used at the Portsmouth Naval Shipyard, including but not limited to installation, fabrication, removal, shop store handling, use as a protective covering, miscellaneous shop | **89. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| use, etc., of asbestos containing insulation and/or material." <br><br> Evidence: PTSMH NAVSHIPYD INSTRUCTION 5100.70A, Feb. 11, 1972, attached as Exhibit E. | In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. <br><br> Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 90. In 1946, the U.S. Navy and GE began operating Knolls Atomic Power Laboratory (KAPL) to develop , among other things, nuclear reactors for Navy ships. <br><br> Evidence: Letter from Sumner Pike to President Truman, Aug. 17, 1951, Exhibit SS. | **90. Disputed.** <br><br> At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. <br><br> Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 91. In 1971, the U.S. Atomic Energy Commission advised GE of the Navy's new asbestos health and safety protocols and directed GE, as General Manager of KAPL, to implement NAVSHIPS Instruction 5100.26 and NAVSHIPS Notice 9390 at KAPL. <br><br> Evidence: Memo from M.E. Miles, Feb. 1971, Exhibit TT. | **91. Disputed.** <br><br> At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 92.  In 1972 the Navy changed its thermal insulation technical manual to require asbestos hazard warnings to personnel, as well as detailed safety precautions and industrial hygiene engineering controls.<br><br>Evidence: NAVSHIPS Manual, Ch. 9390, July 1, 1972, Exhibit UU at 1-2. | **92. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 93.  In 1973, the Navy released NAVMAT P5100, Safety Precautions for Shore Activities, which reiterated the potential hazards of developing asbestosis from asbestos-containing dusts and set forth precautionary work practices and engineering controls to prevent asbestos exposure.<br><br>Evidence: NAVMAT P5100, Jan. 1973, Exhibit VV at 20-22 through 20-23. | **93. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 94. Specifically applying NAVSHIPS Instruction 5100.26 (1971); NAVSHIPS Notice 9390 (1971); Portsmouth Naval Shipyard Instruction 5100.71 (1972); and BUMEDINST 6260.14 (1973) the Portsmouth Naval Shipyard monitored asbestos work aboard the USS John Adams (SSBN-620) during its overhaul period and conducted industrial hygiene inspections to ensure compliance with both Navy and Portsmouth Naval Shipyard Instructions.<br><br>Evidence: Memo from A.V. Munton, Mar. 27, 1974, Exhibit WW. | **94. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 95. Following up on its March 27, 1974 memo regarding work aboard the USS John Adams (SSBN-620) and referencing NAVSHIPS Instruction 5100.26 (1971); NAVSHIPS Notice 9390 (1971); and Portsmouth Naval Shipyard Instruction 5100.71 (1972), the Shipyard recommended that only trained yard personnel from Shop 56 be permitted to remove insulation.<br><br>Evidence: Memo from A.V. Munton, May 6, 1974, Exhibit XX. | **95. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| | Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 96. In 1974 the Navy issued OPNAV Instruction 6260.1, to ensure full compliance with not only existing Navy asbestos safety procedures, but OSHA as well. OPNAV Instruction 6260.1, Control of asbestos exposure to naval personnel and environs.<br><br>Evidence: OPNAVINST 6260.1, Apr. 9, 1974, Exhibit YY. | **96. Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. Mr. Moore, indicated in his report that the Navy did not cease the installation of new asbestos insulation until 1975. In fact, the Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 97. In October 1975 the Navy completely banned the use of asbestos in new ship construction and repair, directing that "asbestos and materials containing asbestos shall not be used in the construction, overhaul, repair, and maintenance of naval vessels."<br><br>Evidence: Department of the Navy, Naval Sea Systems Command, NAVSEA Instruction 5100.2, Oct. 24, 1975, attached as Exhibit ZZ at 2; Military Standard, Thermal Insulation Requirements for Machinery and Piping, MIL-STD-769, Oct. 1975 at 2, attached as Exhibit ZZ-1; Military Specification, Cement, Insulation, High Temperature, MIL-C-2861D, June 20, 1974, attached as Exhibit ZZ-2; Military Specification, Insulation Block, Thermal, | 97.<br><br>    **Disputed.**<br><br><br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. The Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service. |

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| MIL-I-2819F, Oct. 7, 1975, attached as Exhibit ZZ-3; and Military Specification, Insulation, Pipe, Thermal, MIL-I-2781, Oct. 7, 1975, attached as Exhibits ZZ-4. | Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |
| 98.  In 1976 the Navy issued Naval Ships Technical Manual Chapter 635: Thermal Insulation, (1976), containing detailed instructions for permissible levels of asbestos exposure, handling asbestos material, the use of personal protective equipment, and medical monitoring of workers. Chapter 635, based in part upon the 1976 National Safety Council Transactions, unequivocally commanded that "[s]afety precautions must be rigidly adhered to when handling dust producing materials like asbestos…".<br><br>Evidence: Chapter 635, 1976, Exhibit AAA. | 98. **Disputed.**<br><br>At the time of Mr. Hultner's exposure (1971 through 1978) and when Defendant supplied their equipment and parts to the Navy, the Navy did not consider asbestos to be a hazard. The Navy did not start seeking alternatives to asbestos gaskets and packing until around 1978, at the very end of Mr. Hultner's Navy service.<br><br>Evidence: (**Ex. 1**, Moore Report, p. 50-51, 56.) |

**ISSUE II:** Plaintiffs cannot establish that any warning that GE could have placed on its marine turbines delivered to the Navy would have prevented Mr. Hultner's injury. There is no information that GE had that the Navy—the leader in state-of-the-art information as to asbestos hazards, prevention, and controls—did not. There is no evidence that Mr. Hultner relied upon GE labeling on GE equipment when the Navy had thorough and state-of-the-art asbestos safety procedures in place and regularly warned its personnel, instead, the evidence suggests either that the Navy decided not to provide Hultner with information or he decided not to heed such information. Accordingly, as a matter of law Mr. Hultner cannot causally connect his injury to any alleged breach of a duty to warn by GE. In other words, there is no warning that GE could have provided that

would have made a difference to someone in Mr. Hultner's shoes. See Conti v. Ford Motor Co., 743 F.2d 195, 198 (3d Cir. 1984).

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 99.  GE incorporates by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence:  GE incorporates by reference, as though stated in full, the supporting evidence cited in uncontroverted facts numbers 1 through 98 set forth above. | 99. Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence:  Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above. |

**ISSUE III:** GE is entitled to summary judgment because with respect to the GE Navy equipment at issue, 1) the Navy carefully reviewed and approved the design of GE's Navy marine turbines, including any use of asbestos, as MilSpec-compliant; 2) that the Navy likewise approved all warnings to be supplied with GE's Navy marine turbines as MilSpec-compliant despite the absence of any warnings regarding asbestos, precluding any unilateral warnings by GE outside the scope of that review and approval process; and 3) that the Navy acted in these regards despite its own knowledge of asbestos-related hazards. Boyle v. United Technologies Corp., 487 U.S. 500 (1988); Yearsley v. W.A. Ross Construction Co., 309 U.S. 18 (1940); McKay v. Rockwell Int'l Corp., 704 F.2d 444 (9th Cir. 1983).

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 100.  GE incorporates by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence:  GE incorporates by reference, as though stated in full, the supporting evidence cited in uncontroverted facts numbers 1 through 98 set forth above. | 100.  Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence:  Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above. |

**ISSUE IV:** GE bears no duty to warn or protect Mr. Hultner from third-party replacement or component parts that GE did not manufacture or supply and that were used by the Navy with GE Navy equipment after the purchase of such equipment. Plaintiffs cannot satisfy their burden of showing that any required use of such third-party affixed or replacement parts rendered the GE Navy equipment dangerous for its intended use or that GE had no reason to believe that Mr. Hultner would be protected by the Navy from excessive asbestos exposure. See Air & Liquid Sys. Corp. v. DeVries, 586 U.S. 446 (2019).

| **DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE** | **OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE** |
|---|---|
| 101. GE incorporates by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence: GE incorporates by reference, as though stated in full, the supporting evidence cited in uncontroverted facts numbers 1 through 98 set forth above. | 101.  Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence:  Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above. |

**ISSUE V:** Because Mr. Hultner qualifies as a Jones Act seaman, any claim against GE for non-pecuniary damages (including punitive damages and loss of consortium

damages) flowing directly or indirectly from Mr. Hultner's injury is barred as a matter of maritime law. Miles v. Apex Marine Corp., 498 U.S. 19 (1990); see, e.g., The Dutra Group v. Batterton, 588 U.S. 358 (2019), Smith v. Trinidad, 992 F.2d 996 (9th Cir. 1993); see also McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 346, 355 (1990).

| DEFENDANT'S UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE TO CITED FACTS AND SUPPORTING EVIDENCE |
|---|---|
| 102. GE incorporates by reference, as though stated in full, uncontroverted facts numbers 1 through 42 set forth above.<br><br>Evidence: GE incorporates by reference, as though stated in full, the supporting evidence cited in uncontroverted facts numbers 1 through 42 set forth above. | 102. Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above.<br><br>Evidence: Plaintiffs incorporate by reference, as though stated in full, uncontroverted facts numbers 1 through 98 set forth above. |

DATED: April 11, 2025                    FROST LAW FIRM, PC

*/s/ David White*
DAVID WHITE
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I declare that I am over the age of 18, not a party to the above-entitled action, and am an employee of Frost Law Firm PC whose business address is 273 West 7th Street, San Pedro, California 90731.

On April 11, 2025, I served the following document(s) in the following manner(s):

**PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT**

on the following:

**ALL COUNSEL OF RECORD**

☒    (By CM/ECF) By transmitting electronically via CM/ECF the document(s) listed above as set forth on the electronic service list on this date before 11:59 p.m.

☐    (By E-Service.) I electronically served the document(s) via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

☐    (By E-mail) On this date, the above-referenced documents were converted to electronic files and e-mailed to the addresses shown.

☒    (Federal) I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on April 11, 2025.

*/s/ Lane Legg*
_____
An Employee of Frost Law Firm, PC