# EXHIBIT 2

In the Matter Of:

SCOTT L. HULTNER, et al.

vs

ANCHOR-DARLING VALVE COMPANY, et al.

---

Scott L. Hultner, Volume I

August 05, 2024

---



**Scott L. Hultner, Volume I**
**August 05, 2024**

```
            SUPERIOR COURT OF THE STATE OF CALIFORNIA
               FOR THE COUNTY OF LOS ANGELES

LAOSD ASBESTOS CASES            )    JCCP NO. 4674
_____        )
                                )
SCOTT L. HULTNER and            )    CASE NO. 24STCV04699
GERALDINE E. HULTNER,           )
                                )
        Plaintiffs,             )      ┌──────────────────┐
                                )      │   CERTIFIED      │
VS.                             )      │   ORIGINAL       │
                                )      └──────────────────┘
ANCHOR/DARLING VALVE            )
COMPANY, et al.                 )
                                )
        Defendants.             )    (Pages 1 - 86)



                    *** AND ***
```



**Scott L. Hultner, Volume I**
**August 05, 2024**

Page 2

```
1                  UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
2                     LOS ANGELES DIVISION

3    SCOTT L. HULTNER and          )
     GERALDINE E. HULTNER,         )
4                                  )
           Plaintiffs,             )
5                                  )
     VS.                           )      CASE NO.
6                                  )      8:24-cv-00409-JLS-DFM
     AIR & LIQUID SYSTEMS          )
7    CORPORATION (sued             )
     individually and as           )
8    successor-interest to         )
     BUFFALO PUMPS, INC.), et al.) )
9                                  )
           Defendants.             )      (Pages 1 - 86)
10

11
     *********************************************************
12
         ORAL VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF
13                     SCOTT L. HULTNER
                   MONDAY, AUGUST 5, 2024
14                        Volume I
                      Trial Preservation
15                   (REPORTED REMOTELY)

16   *********************************************************

17

18

19

20

21   Reported By:  PENNY L. PABITZKY, CSR, RPR
                    CA CSR NO. 13235
22                  TX CSR NO. 5040
                    WA CSR NO. 22004153
23

24

25   Job Number 310000
```



**GPS LLC**
gpscalendar@gps.llc ~ 214.347.4781

**Scott L. Hultner, Volume I**
**August 05, 2024**

Page 67

```
 1          A.    Yes.

 2                MR. ARCHER:  Hey, Geri.

 3                MRS. HULTNER:  Hey.

 4     BY MR. ARCHER:

 5          Q.    When you worked -- when you were in the Navy

 6     doing this work on these things that we've been talking

 7     about today, did you expect that the work you were

 8     doing on the equipment and whatnot was going to hurt

 9     you?

10          A.    No.  There was no warning, precaution signs.

11     You know, there's no -- in the kits you would get for

12     the replacement material, the gaskets and packing,

13     whatnot, there's no note in there, "Be sure to wear

14     proper protective equipment.  Do not breathe dust."

15     That was never -- that was never brought up.

16          Q.    Did you ever get any warnings from the

17     manufacturers of these products that asbestos was in

18     these products and you should be careful breathing any

19     dust from any work --

20          A.    No.

21          Q.    -- you were doing on them?

22          A.    No.

23                MS. REEG:  Assumes facts, lacks foundation,

24     calls for speculation.

25     BY MR. ARCHER:
```



**Scott L. Hultner, Volume I**
**August 05, 2024**

Page 86

1              CERTIFIED STENOGRAPHER'S CERTIFICATE

2         I, PENNY L. PABITZKY, Certified Shorthand Reporter,

3    Certificate No. 13235, for the State of California, do

4    hereby certify to the following:

5         The foregoing proceedings were taken before me at

6    the time and place set forth, at which time being duly

7    authorized to administer oaths pursuant to Section

8    2093(b) of the California Code of Civil Procedure, I

9    certify the witness in the foregoing deposition was by

10   me duly sworn to testify and placed under oath by me;

11        That said deposition was taken at the time stated

12   via remote conferencing; that the testimony of said

13   witness was reported stenographically to the best of my

14   ability due to the nature of remote communications and

15   thereafter transcribed by me;

16        I further certify that I am neither counsel for nor

17   related to any party to said action, nor in any way

18   interested in the outcome thereof.

19        In witness whereof, I have hereunto subscribed my

20   name this 8th day of August, 2024.

21   _____

22   Penny L. Pabitzky, CSR, RPR
     California CSR 13235 – Expires 07/31/25
23   INDEPENDENT CONTRACTOR FOR:
     GOUCHER PARKER SPIVEY
24   P.O. Box 348
     Millbury, Massachusetts 01527     214-347-4781
25   California Firm Registration Number 103



**GPS LLC**
**gpscalendar@gps.llc ~ 214.347.4781**

In the Matter Of:

SCOTT L. HULTNER, et al.

vs

ANCHOR-DARLING VALVE COMAPNY, et al.

Scott L. Hultner, Volume II

August 13, 2024



GOUCHER PARKER SPIVEY
An Esquire Deposition Solutions Company

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

LAOSD ASBESTOS CASES    )   JCCP NO. 4674
———————————————————   )
                   )
SCOTT L. HULTNER and     )   CASE NO. 24STCV04699
GERALDINE E. HULTNER,   )
                   )
      Plaintiffs,    )   **CERTIFIED ORIGINAL**
                   )
VS.                )
                   )
ANCHOR/DARLING VALVE     )
COMPANY, et al.       )
                   )
      Defendants.    )   (Pages 87 - 291)

\*\*\* AND \*\*\*



**Page 88**

<pre>
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                 LOS ANGELES DIVISION

 3   SCOTT L. HULTNER and          )
     GERALDINE E. HULTNER,         )
 4                                 )
           Plaintiffs,             )
 5                                 )
     VS.                           )    CASE NO.
 6                                 )    8:24-CV-00409-JLS-DFM
     AIR & LIQUID SYSTEMS          )
 7   CORPORATION (sued             )
     individually and as           )
 8   successor-interest to         )
     BUFFALO PUMPS, INC.), et al.)
 9                                 )
           Defendants.             )    (Pages 87 - 291)
10

11

     ********************************************************
12

     ORAL VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF
13                   SCOTT L. HULTNER
               TUESDAY, AUGUST 13, 2024
14                    VOLUME II
               TRIAL PRESERVATION
15             (REPORTED REMOTELY)

     ********************************************************
16

17

18

19

20

21   Reported By:  PENNY L. PABITZKY, CSR, RPR
                    CA CSR NO. 13235
22                  TX CSR NO. 5040
                    WA CSR NO. 22004153
23

24

25   Job Number 310238
</pre>



**Page 195**

1    I believe the John Adams had ship service turbine

2    generators just like were at the prototype.

3            A.    That's correct.

4            Q.    And, again, we talked about those similar to

5    the Juneau.  You have a turbine end, which is the M

6    division jurisdiction.  You have a generator, which is

7    the E division jurisdiction.  Right?

8            A.    Yep.  That's true.

9            Q.    Is it fair that outside of that overhaul you

10    never personally or saw others do repair or maintenance

11    on the ship surface turbine generators outside of the

12    overhaul?

13            MR. ARCHER:  Overbroad as to "never,"

14    assumes facts.

15            A.    We did have a -- we did have a steam leak on

16    the flange coming in that we repaired at sea.  We had

17    to shut down the -- one side.  We had two -- two lines

18    coming in, two engines, two turbines.  We shut down one

19    side to repair a steam leak on there.

20    BY MR. JAMISON:

21            Q.    And is that the main steam pipe coming into

22    the turbine generator?

23            A.    Yes.

24            Q.    And that's the steam that's coming from the

25    reactor compartment through from -- from the steam



Page 196

1    generators through the piping to the -- and abutting --
2    it's a large pipe --
3        A.    Yeah --
4        Q.    -- the actual turbine generator.  And is --
5    is that right?
6        A.    That's right.
7        Q.    Okay.  And so, essentially, you would shut
8    down one of the main propulsions and the ship service
9    turbine generator on one side of the ship, allow that
10   to cool, go cold iron.  So then you were able to remove
11   that flange and re- -- re- -- repair the gasket that
12   goes into that.
13       A.    That's absolutely correct.
14       Q.    Okay.  And this occurred before the
15   overhaul?
16       A.    After.
17       Q.    After the overhaul.
18       At that point in time, you were a machinist's
19   mate first class.
20       A.    I believe I was a B-5.
21       Q.    Is that --
22       A.    Wait a minute.  Yeah, I was a -- I was a
23   first class.
24       Q.    Okay.  And there's a -- when something like
25   that happens, does that fall under a planned



**Page 197**

1  maintenance card, at least giving the directions on how

2  to get it done?

3          A.    That's not a planned maintainance.  That's

4  a -- that's an emergency maintenance.

5          Q.    There's some maintenance component, though,

6  that describes how a machinist's mate should go about

7  resolving this issue, planned or not planned, right?

8          A.    There's always guidelines.

9          Q.    And was it -- were -- were you on watch when

10 that issue was discovered?

11         A.    I was not.  But when I came on watch, the

12 chief petty officer and another first class were --

13 were fixing the problem.

14         Q.    Okay.  Was that problem fixed by the time

15 that you went off your shift?

16         A.    Off the ship?

17         Q.    Shift.

18         A.    Oh, shift.  No.  It was a long repair.  I

19 think it was, like, eight, ten hours.

20         Q.    Okay.  And so we have a chief, and we have a

21 first class who have presumably turned off the ship

22 service turbine generator so there's no steam going to

23 it.

24         A.    On one side.

25         Q.    And it's cool now.  And -- and when you come



**Page 291**

1         CERTIFIED STENOGRAPHER'S CERTIFICATE

2     I, PENNY L. PABITZKY, Certified Shorthand Reporter,

3 Certificate No. 13235, for the State of California, do

4 hereby certify to the following:

5     The foregoing proceedings were taken before me at

6 the time and place set forth, at which time being duly

7 authorized to administer oaths pursuant to Section

8 2093(b) of the California Code of Civil Procedure, I

9 certify the witness in the foregoing deposition was by

10 me duly sworn to testify and placed under oath by me;

11     That said deposition was taken at the time stated

12 via remote conferencing; that the testimony of said

13 witness was reported stenographically to the best of my

14 ability due to the nature of remote communications and

15 thereafter transcribed by me;

16     I further certify that I am neither counsel for nor

17 related to any party to said action, nor in any way

18 interested in the outcome thereof.

19     In witness whereof, I have hereunto subscribed my

20 name this 29th day of AUGUST, 2024.

21 _____

22 Penny L. Pabitzky, CSR, RPR
California CSR 13235 – Expires 07/31/25

23 INDEPENDENT CONTRACTOR FOR:
GOUCHER PARKER SPIVEY

24 P.O. Box 348
Millbury, Massachusetts 01527    214-347-4781

25 California Firm Registration Number 103



In the Matter Of:

SCOTT L. HULTNER, et al.

vs

ANCHOR-DARLING VALVE COMPANY, et al.

Scott L. Hultner, Volume III

August 14, 2024



SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| LAOSD ASBESTOS CASES | ) | JCCP NO. 4674 |
| _____ | ) | |
| | ) | |
| SCOTT L. HULTNER and | ) | CASE NO. 24STCV04699 |
| GERALDINE E. HULTNER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) |  |
| VS. | ) | |
| | ) | |
| ANCHOR/DARLING VALVE | ) | |
| COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | (Pages 292 - 404) |

*** AND ***



**Page 293**

1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
2                  LOS ANGELES DIVISION

3    SCOTT L. HULTNER and        )
     GERALDINE E. HULTNER,       )
4                                )
            Plaintiffs,          )
5                                )
     VS.                         )      CASE NO.
6                                )      8:24-CV-00409-JLS-DFM
     AIR & LIQUID SYSTEMS        )
7    CORPORATION (sued           )
     individually and as         )
8    successor-interest to       )
     BUFFALO PUMPS, INC.), et al.)
9                                )
            Defendants.          )    (Pages 292 - 404)
10

11
     *********************************************************
12
          ORAL VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF
13                     SCOTT L. HULTNER
                  WEDNESDAY, AUGUST 14, 2024
14                      VOLUME III
                   TRIAL PRESERVATION
15                  (REPORTED REMOTELY)

16
     *********************************************************
17

18

19

20

21   Reported By:  PENNY L. PABITZKY, CSR, RPR
                    CA CSR NO. 13235
22                  TX CSR NO. 5040
                    WA CSR NO. 22004153
23

24

25   Job Number 310300



Page 337

1     Q.   And, again, it's your testimony that, to

2   your recollection, looking back over 40 years that no

3   one on that ship wore respirators or masks.  Is that

4   true?

5     A.   None of the Navy personnel or our people

6   didn't.

7     Q.   Well -- and I want to ask about --

8     A.   I don't remember anybody wearing masks on

9   there.  But then, again, we weren't concerned with what

10  they were doing.  They had their jobs.  We had our

11  jobs.

12    Q.   And, sir -- and not to belabor the point --

13  and I think I may be done with documents.

14         And to recap, the Navy's well aware of the

15  dangers of asbestos based upon the documents I've shown

16  to you --

17         MR. ARCHER:  Found -- foundation --

18         MR. JAMISON:  Can I finish my question?

19         MR. ARCHER:  I'm sorry.

20  BY MR. JAMISON:

21    Q.   Based upon the documents I've shown you --

22  and we can go deeper.  Based upon what you've read so

23  far, both before and during the time that you're

24  serving in the Navy, your employer is aware of the

25  dangers of asbestos exposure.  True?



**Page 338**

1          MR. ARCHER:  Foundation, assumes facts not

2    in evidence --

3          A.   The employer may be aware --

4          MR. ARCHER:  -- speculation.

5          A.   The employer may be aware, but I'm not -- I

6    don't know that they made us aware.

7    BY MR. JAMISON:

8          Q.   Would you agree with me that at somewhere

9    above you that there's a breakdown in the chain of

10   command with regards to safety?

11         A.   Absolutely.

12         MR. ARCHER:  Foundation, assumes fact,

13   speculation.

14   BY MR. JAMISON:

15         Q.   Had you been aware that the Navy was

16   requiring the use of respirators and masks, you would

17   have worn those?

18         A.   Had --

19         MR. ARCHER:  Objection; assumes facts,

20   speculation.

21         A.   Had they been provided and then we were told

22   to wear them for our safety, we would have worn them.

23   BY MR. JAMISON:

24         Q.   If the Navy had -- we can agree that all of

25   the work obligations for protecting oneself, handling



Page 339

1   of the materials, and the notion of not working around

2   friable asbestos was not enforced by your employer?

3          MR. ARCHER:  Compound, assumes facts,

4   overbroad, argumentative.

5          A.   By "enforced," you mean forcing us to wear

6   any protective -- we were not -- no.  We were not

7   provided PPE.

8   BY MR. JAMISON:

9          Q.   Do you have any idea why -- why the vast

10  many documents that I've shown you and could show you,

11  why that information never got down to your level?

12          MR. ARCHER:  Speculation, assumes facts,

13  overbroad.

14          A.   My only reason would be -- I don't know.

15  Maybe they didn't -- it just didn't come down to us,

16  for whatever reason.

17  BY MR. JAMISON:

18          Q.   You have sued a number of defendants in this

19  case.  And -- and recognizing what the Navy knew and

20  what the Navy was at least telling people in memos and

21  regulations and whatnot that was needed to be enforced,

22  what more could the equipment manufacturers have done

23  to warn you?

24          A.   Not used asbestos.

25          MR. ARCHER:  Speculation, calls for expert



**Page 450**

1   said and then whatever repair was needed if it broke.

2        Q.   During the course of ordering materials, you

3   yourself never had any contact with anybody off -- off

4   the ship; is that correct?

5        A.   I -- we dealt with our supply parts petty

6   officer.

7        Q.   So you do not know who your supply parts

8   petty officer may have spoken with in order to get the

9   parts necessary to do the repairs and overhaul that you

10  were responsible for aboard John A. Adams, correct?

11       A.   He would have went to the officer -- supply

12  officer to tell him what he needed, and he would have

13  went and got the materials.

14       Q.   And you don't know who the supply officer

15  went to in order to procure the materials.  Is that

16  also correct?

17       A.   He would have went to the manufacturer of

18  the component.  He wouldn't have went to a third party.

19       Q.   Do you have any evidence that you can point

20  to that would indicate that your supply officer went to

21  the manufacturer of the component in order to procure

22  spare parts and component parts?

23       A.   Just my knowledge that whatever repair parts

24  we got were exact fit to the component we were working

25  on.  It wasn't a, you know, half-inch gasket sticking



1    out here or a quarter inch here.  It was an exact

2    replica built for that component.  So that tells me it

3    was supplied by the manufacturer of the component.

4          Q.   And as --

5          A.   And they may not have -- they may not

6    have -- they may not have manufactured it.  But they

7    bought it from somebody that manufactured it to the

8    spec that the component manufacturer gave them and they

9    provided it.  It's not like --

10         Q.   Do you have any understanding --

11         A.   Sorry.  I was going to say it's not like

12   going to Walmart and buying a gasket for a pump because

13   you need a gasket.  You have to go to the manufacturer

14   to get the exact fit.

15         Q.   Do you have any understanding of what a

16   manufacturer was required to supply to the

17   United States Navy when it sold pumps, valves, any

18   other equipment to the Navy?  Do you know what that

19   manufacturer was required to supply?

20         A.   I know the Navy requested a component to do

21   a certain job and they -- and they described what that

22   component needed to do.  And that manufacturer would

23   bid on it.  Several manufacturers probably bid on it.

24   And then they would pick out a -- a winner.  And that

25   manufacturer would provide that equipment to the spec



**Page 493**

1    CERTIFIED STENOGRAPHER'S CERTIFICATE

2    I, PENNY L. PABITZKY, Certified Shorthand Reporter,

3    Certificate No. 13235, for the State of California, do

4    hereby certify to the following:

5    The foregoing proceedings were taken before me at

6    the time and place set forth, at which time being duly

7    authorized to administer oaths pursuant to Section

8    2093(b) of the California Code of Civil Procedure, I

9    certify the witness in the foregoing deposition was by

10   me duly sworn to testify and placed under oath by me;

11   That said deposition was taken at the time stated

12   via remote conferencing; that the testimony of said

13   witness was reported stenographically to the best of my

14   ability due to the nature of remote communications and

15   thereafter transcribed by me;

16   I further certify that I am neither counsel for nor

17   related to any party to said action, nor in any way

18   interested in the outcome thereof.

19   In witness whereof, I have hereunto subscribed my

20   name this 28TH day of AUGUST, 2024.

21   _____

22   Penny L. Pabitzky, CSR, RPR
     California CSR 13235 – Expires 07/31/25

23   INDEPENDENT CONTRACTOR FOR:
     GOUCHER PARKER SPIVEY

24   P.O. Box 348
     Millbury, Massachusetts 01527    214-347-4781

25   California Firm Registration Number 103



In the Matter Of:

SCOTT L. HULTNER, et al.

vs

ANCHOR/DARLING VALVE COMPANY, et al.

Scott Hultner

August 21, 2024



```
           SUPERIOR COURT OF THE STATE OF CALIFORNIA
              FOR THE COUNTY OF LOS ANGELES

LAOSD ASBESTOS CASES          )    JCCP NO. 4674
_____        )
                              )
SCOTT L. HULTNER and          )    CASE NO. 24STCV04699
GERALDINE E. HULTNER,         )
                              )
        Plaintiffs,           )
                              )
VS.                           )
                              )
ANCHOR/DARLING VALVE          )
COMPANY, et al.               )
                              )
        Defendants.           )    (Pages 858 - 1040)
```

**CERTIFIED ORIGINAL**

```
                    *** AND ***
```



**Page 859**

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                  LOS ANGELES DIVISION

 3   SCOTT L. HULTNER and        )
     GERALDINE E. HULTNER,       )
 4                               )
            Plaintiffs,          )
 5                               )
     VS.                         )      CASE NO.
 6                               )      8:24-CV-00409-JLS-DFM
     AIR & LIQUID SYSTEMS        )
 7   CORPORATION (sued           )
     individually and as         )
 8   successor-interest to       )
     BUFFALO PUMPS, INC.), et al.)
 9                               )
            Defendants.          )      (Pages 858 - 1040)
10

11
     ************************************************************
12
        ORAL VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF
13                      SCOTT L. HULTNER
                  WEDNESDAY, AUGUST 21, 2024
14                       VOLUME VI
                    TRIAL PRESERVATION
15                  (REPORTED REMOTELY)

16   ************************************************************

17

18

19

20

21   Reported By:  PENNY L. PABITZKY, CSR, RPR
                   CA CSR NO. 13235
22                 TX CSR NO. 5040
                   WA CSR NO. 22004153
23

24

25   Job Number 310376
```



**Page 860**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| LAOSD ASBESTOS CASES ) | JCCP NO. 4674 |
| ─────────────────────── ) | |
| ) | |
| SCOTT L. HULTNER and ) | CASE NO. 24STCV04699 |
| GERALDINE E. HULTNER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | |
| ) | |
| ANCHOR/DARLING VALVE ) | |
| COMPANY, et al. ) | |
| ) | |
| Defendants. ) | (Pages 858 – 1040) |

*** AND ***

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| SCOTT L. HULTNER and ) | |
| GERALDINE E. HULTNER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | CASE NO. |
| ) | 8:24-CV-00409-JLS-DFM |
| AIR & LIQUID SYSTEMS ) | |
| CORPORATION (sued ) | |
| individually and as ) | |
| successor-interest to ) | |
| BUFFALO PUMPS, INC.), et al.) | |
| ) | |
| Defendants. ) | (Pages 858 – 1040) |

ORAL VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION

OF SCOTT L. HULTNER, VOLUME VI, commencing from

9:32 a.m. to 1:46 p.m., Pacific Time, Wednesday,



Page 861

1   August 21, 2024, taken on behalf of the Plaintiffs and

2   pursuant to the California Rules of Civil Procedure

3   and the provisions stated on the record or attached

4   hereto and reported stenographically via remote

5   videoconference before PENNY L. PABITZKY, Certified

6   Shorthand Stenographer for the state of California, CSR

7   No. 13235, RPR.

8          For the taking of the deposition, the witness

9   was located in Seal Beach, California.

10         For the taking of the deposition, the certified

11  stenographer was located in Nederland, Texas.

12

13         CERTIFIED STENOGRAPHER'S NOTE:  Please note that

14  due to the quality of a Zoom-type videoconference and

15  transmission of data and overspeaking, audio distortion

16  may occur, which may disrupt the process of preparing a

17  verbatim transcript.

18

19         Quotation marks are used for clarity and do not

20  necessarily reflect a direct quote.

21

22

23

24  Job Number 310376

25



**Page 953**

1        A.   I don't recall on the Juneau.  We were there

2   two months.

3        Q.   Was there overhaul work happening on the

4   Juneau?

5        A.   Yes.

6             MR. JAMISON:  Objection; incomplete --

7   BY MR. ARCHER:

8        Q.   Was there --

9             MR. JAMISON:  -- hypothetical, assumes

10  facts, misstates prior testimony.

11            THE CERTIFIED STENOGRAPHER:  I did not get

12  the first objection.  What was it?

13            MR. JAMISON:  Incomplete hypothetical.

14  BY MR. ARCHER:

15       Q.   Does overhaul work -- was there overhaul

16  work happening on the Juneau to the propulsion system?

17       A.   Yes, it was.  Yes, there was.

18       Q.   Does that include the turbines or no?

19       A.   It includes the entire system.  As far as

20  what work was done on them, I don't recall that.  But

21  work was done on the -- from the boilers to the

22  propeller.

23       Q.   I'm not asking you for recall.  That's for

24  the defense lawyers.  I'm asking you for what you know.

25       A.   I know we were in the shipyard for two and a



**Page 954**

1   half -- it's almost two and a half months and work was

2   done, long days every day, on the propulsion system.

3        Q.   Does that include the turbines, even if you

4   can't remember it?

5             MR. JAMISON:  Objection.

6        A.   Yes.  It's part of -- part of the propulsion

7   system.

8             MR. JAMISON:  Objection; leading, assumes

9   facts, lacks prior -- extensive prior testimony,

10  overbroad.

11  BY MR. ARCHER:

12       Q.   Were there GE people in charge of work on

13  turbines during your career in the Navy?

14            MR. JAMISON:  Objection; leading,

15  overbroad, assumes facts, lacks foundation.

16       A.   On the John Adams, because that was a major

17  overhaul, yes.

18  BY MR. ARCHER:

19       Q.   How did you --

20            MR. JAMISON:  Strike those portions based

21  upon speculation.

22  BY MR. ARCHER:

23       Q.   How did you know they were GE folks?

24       A.   Would have been hard hat or white suit with

25  a logo, and they were -- they were there for the



**Page 955**

1    turbines.  They weren't there for, you know, anything

2    else.

3         Q.   Were you doing work in the areas where the

4    turbines were located on the Adams while it was being

5    worked on?

6              MR. JAMISON:  Overbroad, assumes facts,

7    calls for speculation, apparently an attempt to impeach

8    his witness, misstates prior testimony.

9         A.   If you're in the engineering spaces, you're

10   near the turbines.  It was a small space.  Any work

11   being done on the turbine, we were in the area, no more

12   than 6, 7 feet away farthest, so, yes.

13   BY MR. ARCHER:

14        Q.   Did you -- while work was being done on the

15   turbines, did you just take a vacation or something?

16        A.   We were there every day.  We were there

17   every day.

18              MR. JAMISON:  If you guys can slow down so

19   I can get my objections in.

20              Objection; argumentative, assumes facts,

21   incomplete hypothetical, calls for speculation.

22   BY MR. ARCHER:

23        Q.   You're doing work -- well, I'm going to ask

24   you.  Were you doing work while turbines were being

25   worked on, on the Adams?



**Page 956**

1    MR. JAMISON:  Same objection; also leading.

2        A.   Yeah, we were working on other components
3    adjacent to -- there's -- there's two sides.  There's
4    passageways on both sides.  We were working everywhere
5    in the engineering spaces, 13 of us working everywhere.
6    We were there all the time.

7    BY MR. ARCHER:

8        Q.   Were the turbine insulating blankets removed
9    from the turbines at some point to work on the
10   turbines?

11       MR. JAMISON:  Objection; asked and
12   answered, leading, misstates all of Mr. Hultner's prior
13   testimony, assumes facts, lacks foundation.

14       A.   They had to be removed to have access to the
15   turbines.

16   BY MR. ARCHER:

17       Q.   ++ You told the guy sitting on my left that
18   the -- I think he talked you into the fact that those
19   turbines were removed.

20       Is that what you know and what you can say or
21   were they left there?  I don't -- because I want to
22   find out if -- if he talked you into it or if what you
23   know is what you know.

24       MR. JAMISON:  Madam Court Reporter, please
25   mark that question.  I think there's an ethical issue



**Page 957**

1    that needs to be raised with the magistrate.

2              Assumes facts, calls for speculation,

3    leading, incomplete hypothetical, harassing,

4    argumentative.

5    BY MR. ARCHER:

6         Q.    Do you have my question in mind?

7         A.    I'm thinking about it.  Rephrase it one more

8    time.  I want to make sure I got it right.

9         Q.    Were the turbines removed?

10        A.    During the shipyard overhaul, they would

11   have been removed.  They were removed.

12        Q.    Are you able to say, from what you

13   experienced and your knowledge, that you were exposed

14   to dust from the turbine generator blankets?

15             MR. JAMISON:  Objection; calls for expert

16   opinion, calls for speculation, assumes facts,

17   misstates prior testimony, argumentative, and

18   harassing.

19   BY MR. ARCHER:

20        Q.    During the overhaul?

21        A.    Yes.  Blankets were removed.  They sit there

22   for long periods of time for heat resistant.  They

23   deteriorate.  They create dust.  They fall apart.  Yes,

24   dust was there.

25             MR. JAMISON:  Move to strike those portions



**Page 958**

1    in absolute conflict with prior testimony, those

2    lacking in foundation, and those based upon

3    speculation.

4    BY MR. ARCHER:

5        Q.    What are field days?

6        A.    Field days are cleanup days where all hands

7    on board, wiping down walls, wiping down equipment,

8    wiping down piping valves -- anything that would

9    have -- it's debris, dust.  It's getting the ship ready

10   to be -- it has to be spotless.  You're just wiping

11   down everything, making sure everything is spick and

12   span.

13       Q.    Were the GE folks who were there overseeing

14   the work on the turbines, were -- were they wearing

15   masks?

16              MR. JAMISON:  Assumes facts, leading,

17   overbroad, argumentative, calls for speculation, lacks

18   foundation.

19       A.    I don't recall if they were wearing masks or

20   not.

21   BY MR. ARCHER:

22       Q.    If they were wearing masks, would that be

23   something you likely would have -- would know?

24              MR. JAMISON:  Incomplete hypothetical,

25   assumes facts, leading, argumentative, calls for



**Page 959**

1  speculation.

2       A.   If they were wearing masks, I would be

3  concerned as to why they're wearing masks.  But I

4  don't -- I don't know that they were wearing masks or

5  not.

6  BY MR. ARCHER:

7       Q.   I'm asking you if you know if they were

8  wearing masks.

9       Did you ever feel any concern with, "Hey, why

10  are these guys wearing masks?," while the turbines were

11  being worked on?  Did you ever have that thought in

12  your head?

13            MR. JAMISON:  Objection; three questions

14  asked.  They are compound, overbroad, leading, assumes

15  facts, calls for speculation, lacks foundation.

16  BY MR. ARCHER:

17       Q.   Do you have my question in mind?

18       A.   Yes.  Whenever anybody was back there with a

19  mask on, we were concerned because we were not provided

20  masks.

21            MR. JAMISON:  Move to strike the

22  nonresponsive portions based on speculation.

23  BY MR. ARCHER:

24       Q.   Did the turbine generator blankets fit the

25  turbines exactly like a glove?



**Page 960**

1    A.    They were designed to fit exactly like a

2  glove.

3          MR. JAMISON:  Leading to the last question,

4  calls for speculation, lacks foundation.

5  BY MR. ARCHER:

6    Q.    Would the turbines work and function

7  effectively, if at all, if they didn't have the

8  asbestos blankets on them?

9    A.    No.  They spin too fast.  They would get too

10  hot.  They would -- I don't know what -- how long they

11  would last or anything, but they would get too hot.

12  It's extremely hot back there, and that's the main

13  source of the heat in your room is the turbines.

14          MR. JAMISON:  Can you allow me to lodge

15  late objections, because you guys are --

16          MR. ARCHER:  Yeah, we can just say this:

17  All of your objections are preserved --

18          MR. JAMISON:  No, because it's just -- I

19  need --

20          MR. ARCHER:  -- forever.

21          MR. JAMISON:  -- the sky was blue and now

22  it's dark outside.

23          Leading, assumes facts, lacks foundation,

24  incomplete hypothetical, misstates prior testimony,

25  overbroad, vague and ambiguous.



**Page 961**

```
 1   BY MR. ARCHER:
 2        Q.   ++ Is it dark outside?
 3        A.   It's light outside.
 4             MR. JAMISON:  Argumentative.
 5   BY MR. ARCHER:
 6        Q.   ++ Is the sky blue?  Can you see blue sky
 7   outside right now, outside that window even though
 8   there's a cover over it?
 9        A.   I see blue sky.
10             MR. JAMISON:  Madam Court Reporter, please
11   mark those last two questions.
12   BY MR. ARCHER:
13        Q.   ++ I mean, I'm just pointing.  There's like
14   a little screen over the window, right?  And there's
15   some scaffolding outside that window, and -- but you --
16   am I right?  You can see through that little screen out
17   there into the outside.  Am I right or am I wrong?
18             MR. JAMISON:  Objection; argumentative
19   compound, harassing.
20   BY MR. ARCHER:
21        Q.   ++ Am I right or am I wrong?
22        A.   You're right.  I can see the sky.
23        Q.   ++ looks blue to me.  What does it look like
24   to you?
25        A.   It's looks blue.
```



**Page 980**

1          MR. JAMISON:  Objection.  Calls for

2    speculation, calls for expert opinion, assumes facts,

3    lacks foundation.

4          A.   By wiping down the pads, the insulating

5    pads.  Wiping them down and getting any dust off of

6    them.  We didn't -- you know, you could -- you could

7    blow them down, you could wipe them down, but we had to

8    get -- we had to remove the dust.  And any dust back

9    there doesn't come from anything other than

10   deteriorating pads.

11         We -- because our poopie suits were made out of

12   polyester.  So that doesn't flake off and dust or

13   anything.  There's nothing back there that creates --

14   dust doesn't -- you don't have dust on a submarine.

15   You don't have that.

16         MR. JAMISON:  Move to strike those portions

17   based upon speculation, lacking foundation, and calling

18   for an expert opinion.

19   BY MR. ARCHER:

20         Q.   Is it right that there was no dust on the

21   submarine or that dust needed to be taken care of

22   lickety-split on the spot on the submarine?

23         A.   It's -- it's continually cleaned.  It's

24   taken care of right away.

25         Q.   I just want to make sure we understand and



**Page 981**

1   the jury understands that there was dust --

2          A.    There is dust --

3          Q.    -- created from -- hold on -- from the work

4   that you and others did.  However, it was taken care

5   of.  Is that right or wrong?

6          A.    No.  That's right.  We -- we clean up as we

7   go.  It's a -- you're constantly cleaning.

8          Q.    And when Bailey was asking you about

9   De Laval pump work a little while back, your -- one of

10  your answers was "it's possible."  Right?

11         What I'm asking you is:  From what you know,

12  what you experienced, and your -- and, you know, what

13  you understand from the work you did, were the gaskets

14  and the packing asbestos that you removed and replaced

15  on the De Laval pumps?

16              MR. BAILEY:  Lacks foundation, speculation,

17  assumes facts not in evidence, and misstates testimony.

18         A.    Going back, all the pumps we worked on had

19  the asbestos gaskets and they were removed and

20  replaced.

21  BY MR. ARCHER:

22         Q.    What about packing?

23         A.    And packing as well.

24         Q.    How often did you guys do field day work?

25  Was that a once-in-a-great-while thing or what?



Page 1006

1      A.    Pretty much.  I was watching it.

2      Q.    Is there any other work on the USS John

3  Adams that was ever done by you or someone in your

4  presence on any turbine aboard that ship during the

5  time you served on her?

6           MR. ARCHER:  Overbroad as to "any other,"

7  assumes facts.

8           MR. JAMISON:  Let me -- let me strike the

9  question.

10  BY MR. JAMISON:

11      Q.    Excluding lube oil work (indiscernible)

12  that's connected to the turbine --

13           (Certified Stenographer seeks

14  clarification.)

15  BY MR. JAMISON:

16      Q.    Excluding lube oil system work related to

17  the turbines, perhaps, or other systems unrelated to

18  the actual turbine itself, is there any other work that

19  you did or you saw others do to that turbine during

20  the -- any turbine on board the USS John Adams when you

21  were assigned to her?

22           MR. ARCHER:  Same.

23      A.    No.  I don't even -- no, that's a big-ticket

24  item that -- that work would have been -- even if it

25  would have blown up at sea, we would have isolated that



**Page 1007**

1  and come back into the tender to have that work done.

2  That was beyond our expertise.

3  BY MR. JAMISON:

4       Q.   Last week I had asked you about did you ever

5  speak with any person that you, in your lifetime, that

6  you understand was employed by GE; and the response was

7  no.  In response to Mr. Archer's question, you said

8  that there was GE reps present.

9       A.   That doesn't mean we talked.

10      Q.   Okay.  So -- and that's a good starting

11 spot.  You never spoke with someone in your life,

12 including aboard the USS John Adams, that was a

13 representative of General Electric.  Fair?

14      A.   I was shown a document in my -- in my

15 service record where I went to a three-day school on

16 turbines.  So that would have been given by GE people.

17 I just don't recall the three-day school, but

18 apparently I was there.

19      Q.   And whether that was, I think, sometimes

20 there's NObs contracts, whether that was a NObs

21 contract through a shipyard turbine expert or whether

22 or not that was really GE teaching that class, I

23 believe, last week you said you just don't -- don't

24 remember.  Is that fair?

25      A.   That's fair.



Page 1008

1    Q.   So GE reps -- it sounded to me like when Ron

2  was asking you questions, that you recalled people that

3  you believe were employed by GE aboard the ship during

4  the overhaul.  Is that fair?

5    A.   It would have been guiding the removal of

6  the turbine.

7    Q.   Okay.  And so it sounds to me like these

8  persons' roles with regard to the ship during that

9  overhaul, first and foremost related primarily with the

10 shipyard workers; is that right?

11         MR. ARCHER:  Foundation, overbroad, assumes

12 facts.

13 BY MR. JAMISON:

14   Q.   And they were there to --

15         THE CERTIFIED STENOGRAPHER:  Excuse me.  I

16 need the answer, please.

17   A.   Yes.  They were associated with the shipyard

18 workers.

19         MR. JAMISON:  And you got the objection

20 too?

21         THE CERTIFIED STENOGRAPHER:  Correct.

22 BY MR. JAMISON:

23   Q.   What they did or didn't discuss with the

24 shipyard workers with regards to insulation, the actual

25 disconnection or whatnot, you weren't involved in that

